[No. D044768. Fourth Dist., Div. One. Jan. 24, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
EFRAIN QUINTERO, Defendant and Appellant.

1154

## Counsel

Sylvia Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Arlene Aquintey Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HUFFMAN, J.**—A jury convicted Efrain Quintero of aggravated mayhem (Pen. Code,[1] § 205; count 1), torture (§ 206; count 2), carjacking (§ 215, subd. (a); count 3); robbery (§ 211; count 4), assault with a deadly weapon (§ 245, subd. (a)(1); count 5), battery with serious bodily injury (§ 243, subd. (d); count 6), and unlawful taking and driving of a vehicle (Veh. Code, § 10851, subd. (a); count 7). The jury also found true allegations that Quintero had personally used a deadly and dangerous weapon, to wit, a razor blade knife, during the commission of all counts (§§ 1192.7, subd. (c)(23), 12022, subd. (b)(1), (b)(2)), and personally inflicted great bodily injury upon the victim during the commission of counts 3 through 7 (§§ 1192.7, subd. (c)(8), 12022.7, subd. (a)).

Quintero admitted allegations he had committed all the violent felonies while on state prison parole (§ 1203.085, subd. (b)), and in bifurcated proceedings, he further admitted allegations he had suffered six no probation

---

[1] All statutory references are to the Penal Code unless otherwise specified.

priors (§ 1203, subd. (e)(4)), had been convicted of felony vehicle theft and receiving a stolen vehicle within the meaning of section 666.5, subdivision (a), and had served three separate prior prison terms (§ 667.5, subd. (b)).

The trial court sentenced Quintero to an indeterminate life term with the possibility of parole on count 1 plus a determinate term of 10 years, consisting of a consecutive five-year midterm for count 3, a consecutive two years for the personal infliction of great bodily injury enhancement for count 3,[2] and one year for each of the three prison priors. The court also imposed a concurrent midterm of one year on count 4,[3] and imposed and stayed sentences on counts 2, 5, 6 and 7 under section 654.

Quintero appeals, contending the evidence was insufficient to support the aggravated mayhem and torture convictions in counts 1 and 2, the trial court committed reversible error when it refused to instruct the jury that an honest but unreasonable belief in the need for self-defense would negate the malice necessary to prove the aggravated mayhem charge, and the assault and battery convictions in counts 5 and 6 must be reversed because they were necessarily included offenses of the count 1 aggravated mayhem offense. The People concede the count 6 conviction for battery with serious bodily injury must be reversed. We reverse the count 6 conviction and affirm the judgment as modified to correct an unauthorized sentence.

## FACTUAL BACKGROUND

Shortly after noon on Christmas day, 2002, police and paramedics were summoned to an Albertsons parking lot in Carlsbad where Jose Luis Barajas

---

[2] The court stayed the three-year great bodily injury enhancement for count 3 pursuant to section 654.

[3] The transcript of the sentencing, the court minutes and the abstract of judgment reflect the court imposed an unauthorized term of one-third the midterm for the count 4 robbery offense. Because concurrent terms are not part of the principal and subordinate term computation under section 1170.1, subdivision (a), they are imposed at the full base term, not according to the one-third middle term formula, even though they are served at the same time. A concurrent term begins when it is imposed and runs together with the other terms, with the latest expiring term controlling. (§§ 669, 1170.1, subd. (a); see *People v. Bruner* (1995) 9 Cal.4th 1178, 1182, fn. 3 [40 Cal.Rptr.2d 534, 892 P.2d 1277]; *People v. Matthews* (1999) 70 Cal.App.4th 164, 169, fn. 4 [82 Cal.Rptr.2d 502].) Such an unauthorized sentence is subject to correction on review. (*People v. Menius* (1994) 25 Cal.App.4th 1290, 1295 [31 Cal.Rptr.2d 15].)

In response to the trial judge's request for assistance if she is wrong in this sentencing matter, we vacate the unauthorized sentence on count 4 and correct it to reflect imposition of the full three-year midterm to run concurrently with count 1 and order the trial judge to amend the court minutes and abstract of judgment accordingly. We do so rather than remand for resentencing because the record clearly reflects the trial judge's intention to run the count 4 sentence concurrently and only to impose 10 years consecutive to the count 1 life term. (§ 1260.)

was found in shock, bleeding from cuts on his face and chest, and wobbly and faint. A witness who had arrived at Albertsons had seen Barajas coming out of the driver's side of a white truck, covered with blood, with cuts on his face, and the truck speeding off eastbound on Carlsbad Village Drive. The witness followed the truck and obtained the license plate number before returning to Albertsons to tend to Barajas because his injuries looked life-threatening. When he returned, two other people were tending to Barajas. One woman had taken a towel and had pushed sagging bleeding skin from Barajas's nose to his ear, to hold in place to stop the bleeding. The woman's husband had called 911. Barajas, who only spoke Spanish, responded "yes" to the inquiry of whether the man who took off in the truck was the one that had done this to him.

Barajas was briefly interviewed by a Spanish-speaking police officer before being transported to the hospital and then again at the hospital. He was barely able to speak, but indicated he had driven to Albertsons and that a friend, whose name he could not remember, had slashed him with a knife and taken his truck. The officer noted a strong smell of alcohol on Barajas's breath. At the hospital, after Barajas received some medical assistance, he was able to tell the officer his name, that the friend had asked him to drive him to Albertsons, and had pushed him out of the truck after he attacked and robbed him. When Barajas overheard Quintero's name being broadcast over the officer's radio, he indicated it was Quintero who was the person who cut his face. A "be on the lookout" for Quintero was put out to all law enforcement agencies.

Later that day, a transient alerted a security guard at a Smart & Final store in Carlsbad that there were bloody clothes and other things in a dumpster there. The security guard then called the Carlsbad police, who responded to the area and found in the dumpster a bloody truck seat cover, a bag, a long-sleeved, button-down flannel jacket with blood stains, a short sleeve white shirt, and a wallet with identification showing it belonged to Barajas.

Meanwhile, Barajas was treated at Scripps Hospital by Dr. Munish Batra, a plastic and craniofacial surgeon, who performed several surgeries on Barajas for the multiple wounds to his face, nose, arms and hands. Barajas had severe lacerations on his cheeks and face which had cut through facial nerves controlling smiling, affecting the ability to secrete saliva inside the mouth and the feeling sensation in the lower lip, and allowing a person to turn his lower lip up or down. Batra also treated a wound close to Barajas's carotid artery and internal jugular vein, a three-centimeter- long laceration to the cartilage and skin of his nose, and a 27-centimeter laceration on his left upper arm.

Batra additionally performed surgery on Barajas's hands, which had damage to both palms and the nerves and tendons with cuts through the right thumb and left flexor tendon and index finger.

On December 26, 2002, Barajas was again interviewed at the hospital and shown a photographic lineup, but was unable to identify Quintero, whose photograph was included in the lineup. When Barajas was shown another photograph of Quintero, he recognized him as the man who had slashed him and taken his truck.

Quintero was subsequently arrested on a parole warrant when he tried to enter the United States from Mexico on February 5, 2003. Carlsbad Police Department Detective Derek Harvey interviewed Quintero the next day. After Harvey confronted Quintero about the conflicts in his three different versions of what had happened Christmas day with the evidence found in the dumpster, Quintero said he was not going to waste any more time and proceeded to give yet a fourth version of the events that day. Quintero said that en route in the truck with Barajas on December 25, 2002, to get more beer, with stops at the closed Lola's Market and Circle K before arriving at Albertsons, Barajas had propositioned him, offering to pay him for a blow job. Quintero told Barajas to "fuck off." After Barajas parked near Albertsons, he pulled Quintero's head toward his crotch which angered Quintero. Feeling disrespected, Quintero reached into the front pocket of the truck's seat cover, retrieved a utility knife with a retractable razor blade and cut Barajas's face. He then got Barajas in a headlock and stabbed and slashed him before pushing him out of the truck and driving away. Quintero discarded the bloody clothing and Barajas's wallet in a dumpster at a Smart & Final before driving to Tijuana, Mexico, where he subsequently traded Barajas's white truck for a smaller brown Ford Courier truck plus money.

Quintero was charged with the instant crimes. In addition to the above evidence being presented at trial, Barajas, who spoke only Spanish, testified with the assistance of an interpreter that at the time of these offenses he had been living inside his white Chevrolet truck with a camper shell in front of a residence of a friend in Carlsbad. Barajas woke up at around 6:00 a.m. on Christmas morning and proceeded to drink an 18-pack of beer with three other men in his friend's backyard. Later that morning, Quintero and another man joined the group in the backyard drinking beer. Barajas had met Quintero 20 years earlier at a family event but had not spoken with him since that time. While they were drinking, Quintero told Barajas that people were saying bad things about him.

When the group ran out of beer, Barajas offered to go to Albertsons to buy more beer as he was also going to buy some food for dinner. He was surprised when he got into his truck and Quintero was sitting in the passenger seat. Although Quintero did not speak, Barajas just assumed he had gotten into the truck because he had to buy something from Albertsons.

When they arrived at the store, there were not many cars in the parking lot and Quintero told Barajas to "park in here" on the side of the store. When Barajas stopped the truck, Quintero suddenly began to cut him on his face with one of his work knives that he kept in the truck for his construction work. Quintero then grabbed Barajas by the hair, cut his right cheek near the mouth, and turned him around by the hair, pulling his head down to the seat near Quintero's waist and knee. While Quintero held Barajas's head down, he took Barajas's gold chain with the Virgin of Guadalupe medallion, which included a small diamond, a gold bracelet and his wallet which contained about $800. Quintero then proceeded to use his right arm to make uppercut type motions to slash Barajas's face. He cut Barajas's arms and hands when Barajas tried to cover the front of his face. He also stabbed Barajas in the neck and chest.

When Quintero stopped stabbing and slashing Barajas with the knife, he told him to jump into the back of the camper. Afraid for his safety, Barajas jumped out of the truck while Quintero was distracted by looking through Barajas's wallet. Quintero then drove off in the truck.

As a result of the attack, Barajas has a scar running from the bottom of his right ear to the base of his nose, a scar on his left tricep, his left forearm and portions of his left elbow, and a six- or seven-inch-long scar on his left hand and forearm. Barajas's injuries have affected the use and strength of his hands. He can no longer use them in his work, and he continues to need rehabilitation sessions three times a week.

Detective Harvey additionally testified about the specifics of Quintero's different versions of events given when he was interviewed after his arrest. In Quintero's first three versions, Barajas had parted company with him before Barajas had gone to Albertsons. In the fourth rendition, Quintero told Harvey he cut Barajas's face because he was angry and felt disrespected, telling Barajas, "Fuck you, fool," and asking him, "How do you like this?" as he cut him.

Quintero testified in his own defense. His testimony consisted mainly of the fourth version of the story he had told Harvey. He had spent the night at Barajas's friend's house in Carlsbad on Christmas Eve of 2002 after having an argument with his brother. Sometime between 7:00 and 9:00 a.m. on

Christmas morning, Quintero joined Barajas and others in the backyard to drink some beer. When they ran out of beer about two hours later, the group pooled their money and the friend told Quintero to go with Barajas to buy the beer. Quintero got into the truck with the group's money.

Quintero testified Barajas first drove to the neighborhood grocery store, Lola's Market. At some point, Barajas grabbed a gun, wrapped it up in a jacket and tossed it into the sliding back window of the truck's camper. When he discovered the market closed, he remarked that he should "shoot up this store." Quintero convinced him not to do so. Barajas then asked him whether he had ever had sex with a man. Quintero, scared and offended, replied, "No, are you crazy?" When Quintero got out of the truck and started walking away, Barajas said he was just joking and he would not ask that again.

When Quintero got back into the truck, Barajas drove to the Torrito Market, but it was also closed. Barajas again asked Quintero about having sex with a man and Quintero again answered, "no" as he started to once more get out of the truck. Barajas told him he would not say anymore and they should go to Albertsons.

According to Quintero, Barajas smelled of alcohol and was driving so poorly that he ran into the sidewalk when they reached Albertsons. Finding the store closed, Quintero suggested they go somewhere else, but Barajas wanted to stay a while. He laughingly asked Quintero again about sex with a man, telling him not to get mad. Quintero told Barajas he was crazy and tried to leave, but Barajas grabbed his left arm, trapping him between the steering wheel and Barajas's chest. Barajas then pushed Quintero under the steering wheel toward his genital area. When Barajas held his head down and would not let him go, Quintero became angry, tried to punch him and grabbed one of the seven little knives or razor blades in the truck and threatened to slash Barajas. When Barajas did not let go, Quintero swung his arm over his head four or five times slashing Barajas's face with the knife. Afterwards, when he told Barajas to look at himself, Barajas hugged him, laughed and told him not to be mad, scared or worried.

When Barajas tried to grab Quintero again, Quintero slashed at Barajas's hands several times. In response to Barajas's comment, "Look what you did, Quintero," Quintero responded, "I told you not to say that to me." Barajas then got out of the truck on his own and started walking in the parking lot near some people. Quintero left with Barajas's truck because he was covered in blood and was scared about what he had done. He drove to a Smart & Final store and threw anything with blood on it in the dumpster. He removed $700 to $800 from Barajas's wallet he found in the truck before also tossing it in the dumpster. He kept Barajas's gun and drove to Tijuana, Mexico,

where he stayed for about a month spending Barajas's money before trading the truck in for a smaller one. He claimed a Mexican police officer took Barajas's gun from him during his stay in Mexico.

On February 4, 2003, Quintero was arrested as he tried to walk across the Mexican-American border. He initially lied to Detective Harvey when he was interviewed at the San Diego County jail because the true story was too embarrassing, he felt disrespected and did not want to cooperate. Quintero denied he had cut Barajas in order to scar his face or make him feel pain because he was angry at the sex comments, or that he had done so because of any past animosity between them or to take Barajas's property. On cross-examination, Quintero admitted he had previously been convicted of four felonies involving moral turpitude.

## DISCUSSION

### I

### *SUFFICIENCY OF THE EVIDENCE*

Quintero contends the evidence was insufficient to support his convictions for the count 1 aggravated mayhem and the count 2 torture. He specifically argues there was no evidence to show he had the specific intent to maim Barajas or to cause him permanent disability or disfigurement, or evidence to show he intended to inflict cruel and extreme pain. We disagree, concluding there was sufficient evidence from which the jury could find Quintero had the requisite specific intent for each crime.

### A. *Applicable Law*

In reviewing the sufficiency of the evidence to support a conviction, we determine " 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' [Citations.]" (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Under such standard, we review the facts adduced at trial in full and in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether there is substantial direct or circumstantial evidence the defendant committed the charged crime. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].) The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's

conclusions. (*People v. Arcega* (1982) 32 Cal.3d 504, 518 [186 Cal.Rptr. 94, 651 P.2d 338]; *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 996 [279 Cal.Rptr. 236].)

In making the determination, we do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. (Evid. Code, § 312.) We simply consider whether " ' "*any* rational trier of fact could have found the essential elements of [the charged offenses] beyond a reasonable doubt." ' [Citations.]" (*People v. Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960].) Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict" the conviction will not be reversed. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429 [180 Cal.Rptr. 391].)

■ With regard to the commission of aggravated mayhem, section 205 provides in relevant part that, "[a] person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." Aggravated mayhem is a specific intent crime which requires proof the defendant specifically intended to cause the maiming injury, i.e., the permanent disability or disfigurement. (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 833 [267 Cal.Rptr. 283].) "[S]pecific intent may be inferred from the circumstances attending an act, the manner in which it is done, and the means used, among other factors." (*People v. Lee* (1990) 220 Cal.App.3d 320, 325 [269 Cal.Rptr. 434].) Thus evidence of a "controlled and directed" attack or an attack of "focused or limited scope" may provide substantial evidence of such specific intent. (*Id.* at p. 326.) However, where the evidence shows no more than an "indiscriminate" or "random" attack, or an "explosion of violence" upon the victim, it is insufficient to prove a specific intent to maim. (*Ibid.*)

■ With regard to the crime of torture, section 206 provides that, "[e]very person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." As with aggravated mayhem, the intent necessary for torture, i.e., to cause cruel or extreme pain, can be established by the circumstances of the offense. (*People v. Hale* (1999) 75 Cal.App.4th 94, 106 [88 Cal.Rptr.2d 904] (*Hale*).) In addition, "[t]he condition of the victim's body

may establish circumstantial evidence of the requisite intent." (*People v. Mincey* (1992) 2 Cal.4th 408, 433 [6 Cal.Rptr.2d 822, 827 P.2d 388] (*Mincey*).)

## B. *Analysis*

Here, Quintero focused his initial attack on a particularly vulnerable portion of Barajas's body, his head, using deliberate uppercut motions to slash his face many times with a retractable bladed knife. This action gave his blows more force and thus the greater ability to inflict serious injury than if he had merely jabbed or stabbed at Barajas's face. He held Barajas by the hair as he cut at his right cheek and then turned him around by the hair to attack his face full on. The injuries to Barajas's arms and hands were caused by Barajas's attempts to protect and cover his face. Quintero stopped his attack once he had severely maimed Barajas's face. From these facts, a jury could reasonably conclude that Quintero essentially limited his attack to Barajas's face rather than indiscriminately attacking him, and find that the attack was guided by the specific intent of inflicting serious injury upon Barajas's face and head. (See *People v. Park* (2003) 112 Cal.App.4th 61, 68–70 [4 Cal.Rptr.3d 815]; *People v. Campbell* (1987) 193 Cal.App.3d 1653, 1668–1669 [239 Cal.Rptr. 214].)

A reasonable jury could also infer from these facts as well as from Quintero's own testimony and statements he made to the investigating detective that Quintero had the intent to permanently disfigure Barajas during the attack. Not only were the cuts to Barajas's face made so deeply that much of his skin was sagging, "exposing everything," and leaving him with permanent deep scars on his face, the nerves and tendons of his hands were so severely cut that he had lost any strength in them to be able to continue in his construction work. Quintero told the detective that when he was finished slashing Barajas's face he said to him, "Fuck you, fool," and asked him, "[h]ow do you like this?" Quintero also testified he told Barajas after the attack, "I told you not to say that to me." A jury could reasonably conclude from the totality of this evidence that Quintero had had an intent to maim Barajas and to cause him permanent injury when he attacked him sufficient to support the aggravated mayhem conviction.

Similarly, a jury could reasonably conclude from the totality of the injuries inflicted on Barajas and the circumstances surrounding the offense that Quintero intended to cause cruel or extreme pain to Barajas and did so. (See *Mincey, supra,* 2 Cal.4th at p. 433; *Hale, supra,* 75 Cal.App.4th at p. 106.) As noted above, the circumstances of the crime showed it was deliberately focused on Barajas's face, and the injuries were severe and surely caused extreme pain. The jury could also conclude from Quintero's statements to which he testified

or that were made to the detective that he had had a persuasive or sadistic purpose in inflicting the injuries on Barajas in order to cause him extreme pain.

■ In sum, sufficient evidence supports both Quintero's convictions for aggravated mayhem and torture because the record contains substantial evidence from which a reasonable jury could have found beyond a reasonable doubt that Quintero had the specific intent to maim and the intent to cause cruel and extreme pain to Barajas.

II

### REFUSAL TO INSTRUCT ON IMPERFECT SELF-DEFENSE

Relying on *People v. McKelvy* (1987) 194 Cal.App.3d 694 [239 Cal.Rptr. 782] (*McKelvy*), Quintero requested the court instruct the jury on imperfect self-defense under CALJIC No. 5.17[4] as to the count 1 aggravated mayhem and its lesser offense of simple mayhem. The prosecutor objected, arguing the discussion regarding the imperfect self-defense instructions in *McKelvy* was dicta, and that the holding in *People v. Sekona* (1994) 27 Cal.App.4th 443 [32 Cal.Rptr.2d 606] (*Sekona*), which found such instruction inappropriate in mayhem cases, should be followed.

After further discussion, the trial court stated: "[W]hen you have an imperfect self-defense, it does relate more to murder than an intent which is either sadistic in purpose or that is to disfigure. That seems to go beyond what the imperfect self-defense definition is pertaining to. [¶] It doesn't appear to this court that to give imperfect self-defense would be an appropriate instruction, under the circumstances of this case, not only because the defendant was not in peril of his life—well, he never said he thought he was, never said that, never said he thought he was in danger. He just didn't say any of those things, didn't say he was going to be harmed. [¶] Therefore, this

---

[4] CALJIC No. 5.17 provides: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the some belief. Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter. [¶] As used in this instruction, an 'imminent' [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer. [¶] [However, this principle is not available, and malice aforethought is not negated, if the defendant by [his][her][unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his][her] adversary's [use of force], [attack] [or] [pursuit.].] [¶] [This principle applies equally to a person who kills in purported self-defense or purported defense of another person.]"

court does not believe that imperfect self-defense is an appropriate instruction under these circumstances, and it declines to give it."

Although the court refused to instruct the jury with an imperfect self-defense instruction regarding the aggravated mayhem count, it did instruct the jury on self- defense against assault and battery, as lesser crimes to the aggravated mayhem, as well as to the count 5 aggravated assault and the count 6 battery with serious bodily injury.

On appeal, Quintero asserts the trial court prejudicially erred when it refused to instruct the jury that an honest but unreasonable belief in the need for self-defense would negate the malice necessary to prove the charge of aggravated mayhem or the lesser included offense of mayhem. Relying on *McKelvy, supra,* 194 Cal.App.3d 694, Quintero argues, as he did below, that because the facts show he actually feared he was about to be beaten by Barajas, the court was required to instruct as requested on imperfect self-defense as a partial defense to mitigate his alleged intent to act maliciously, that is, with "a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (See §§ 7, 203, 205.) He claims he was prejudiced by the court's failing to so instruct, as this denied him due process, because it prevented the jury from properly considering his theory of defense. We disagree.

■ Although a trial court has a sua sponte duty to instruct on all general principles of law closely connected to the facts of the case and this duty extends to defenses which are supported by substantial evidence and are not inconsistent with the defense theory (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903]), a court need not give a requested instruction on a purported defense unless it is supported by evidence that is substantial, i.e., that the evidence is reasonable, credible and of solid value. (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1] (*Flannel*), superseded by statute on another point as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 773 [30 Cal.Rptr.2d 33, 872 P.2d 574]; see *People v. Breverman* (1998) 19 Cal.4th 142, 148–149 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Here, as the trial court found, there was no substantial evidence to show Quintero had an unreasonable belief that any harm was imminent. Although he testified he was scared, angry and offended by Barajas's alleged sexual advances and fought to have Barajas release his hands from holding his head down toward his lap, Quintero did not say Barajas ever struck or threatened him, or that he believed he was imminently in harm's way. There was simply no evidence presented from which a reasonable jury could be persuaded that Quintero attacked Barajas in "the actual but unreasonable belief in the

necessity to defend against imminent peril to life or great bodily injury." (See *Flannel, supra,* 25 Cal.3d at p. 684.)

 Moreover, as the trial court correctly noted, imperfect self-defense relates more to murder than it does to mayhem. As our Supreme Court explained in *People v. Barton* (1995) 12 Cal.4th 186, 200–201 [47 Cal.Rptr.2d 569, 906 P.2d 531], "imperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter." (*People v. Michaels* (2002) 28 Cal.4th 486, 529 [122 Cal.Rptr.2d 285, 49 P.3d 1032] (*Michaels*).) Under this type of "judicially developed theory" (*People v. Rios* (2000) 23 Cal.4th 450, 465 [97 Cal.Rptr.2d 512, 2 P.3d 1066]) of voluntary manslaughter, an honest but unreasonable belief in the need to defend can negate malice aforethought thereby reducing murder to manslaughter. (*Barton, supra,* 12 Cal.4th at pp. 200–201.) This well-established doctrine · or theory, often referred to as the "*Flannel* defense" (*Flannel, supra,* 25 Cal.3d at p. 679), simply "has no application to a charge of mayhem." (*People v. Hayes* (2004) 120 Cal.App.4th 796, 801 [15 Cal.Rptr.3d 884] (*Hayes*).)

Although *McKelvy,* the case upon which Quintero relies, stated in dictum by a single justice that the *Flannel* defense could apply to charges of mayhem, but the subject judgment should be affirmed because there was no sua sponte duty to provide the instruction, that authoring justice also recognized the "malice" required for mayhem differs from the "malice aforethought" required for murder with which *Flannel* was concerned, and each entails different means of proof. (*McKelvy, supra,* 194 Cal.App.3d at p. 702.) Nonetheless, the lead author reasoned that in the future, a defendant who acted with the honest but unreasonable belief in the need for self-defense could not be said to have acted "maliciously," and he or she could only be found guilty of an assault or a battery. (*Ibid.*) However, the opinion did not garner a majority for its conclusion that imperfect self-defense was potentially applicable to the crime of mayhem because the two nonauthoring justices concurred only in the result. (*Id.* at pp. 707–708.)

No published opinion has adopted the *McKelvy* rationale. In addition to the court in *Hayes, supra,* 120 Cal.App.4th 796, which held the so-called *Flannel* defense was not applicable to charges of mayhem because the belief that one is acting in self-defense, whether reasonable or unreasonable, has no tendency to negate the element of "malice" as defined in section 7 and incorporated in the statutory definition of mayhem (*Hayes, supra,* 120 Cal.App.4th at p. 803), the court in *Sekona, supra,* 27 Cal.App.4th 443 also expressly disagreed with the *McKelvy* reasoning, concluding there was no sua sponte obligation to give an imperfect self-defense instruction to a charge of mayhem and that such so-called defense is inapplicable to the crime of mayhem. (*Sekona, supra,* 27 Cal.App.4th at pp. 451–457.) Our Supreme Court has cited

*Sekona* with approval for the proposition imperfect self-defense does not to apply to the crime of mayhem. (*Michaels, supra*, 28 Cal.4th at p. 530.)

■ Although *Sekona, supra*, 27 Cal.App.4th 443 and *Hayes, supra*, 120 Cal.App.4th 796 involved the issue whether there was a sua sponte duty to instruct on imperfect self-defense for the general intent crime of mayhem, which is a lesser included offense of aggravated mayhem, we believe the reasoning of those cases is equally applicable to the greater offense. Even though aggravated mayhem requires proof of a specific intent to maim the victim, it still requires proof that the person who had such specific intent to inflict the maiming injury did so "maliciously, that is, with an unlawful intent to vex, annoy, or injure another person." (CALJIC No. 9.32; see § 205.) In other words, the same malice element is required for both the lesser offense of mayhem and the greater offense of aggravated mayhem and is still different from the malice aforethought required for murder. Thus, the same rationale in *Sekona* and *Hayes* regarding imperfect self-defense not being applicable to the crime of mayhem also pertains to aggravated mayhem.

Moreover, even assuming imperfect self-defense applied to aggravated mayhem, on this record we would find the trial court's error in refusing to instruct on such theory harmless. Because the jury was fully instructed on aggravated assault and the lesser included offense of mayhem as well as on the specific intent and other mental states required for each, the jurors could have convicted Quintero of simple mayhem, if they had believed he lacked the specific intent to maim or disfigure Barajas. That the jury did not do so and found Quintero had committed the greater offense of aggravated mayhem, which is inconsistent with a finding he had had an honest but unreasonable belief in the need to defend himself, indicates it is not reasonably probable that a more favorable outcome would have resulted had the trial court·given an instruction on imperfect self-defense in this case. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

III

*LESSER INCLUDED OFFENSES*

Quintero finally contends his convictions of assault with a deadly weapon or by means of force likely to produce great bodily injury and battery with serious bodily injury must be reversed because they were necessarily included offenses of his aggravated mayhem conviction. The People concede battery with serious bodily injury is a necessarily included offense of aggravated mayhem and should be reversed, but assert Quintero's assault conviction is not a lesser included offense of aggravated mayhem. We agree.

■ Although the general rule in California is that a single act or course of conduct by a defendant can lead to multiple convictions (§ 954; *People v. Pearson* (1986) 42 Cal.3d 351, 354 [228 Cal.Rptr. 509, 721 P.2d 595]), "a judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]" (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034 [16 Cal.Rptr.3d 902, 94 P.3d 1098] (*Montoya*).) For purposes of this rule, "we apply the elements test, asking whether ' " 'all the legal ingredients of the corpus delicti of the lesser offense [are] included in the elements of the greater offense.' " ' [Citation.] [Citation.] In other words, 'if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' [Citation.]" (*Ibid.*)

We, therefore, accept the People's concession and reverse count 6 because the completed aggravated mayhem, of necessity, includes the completed offense of battery with serious bodily injury. (*People v. Ortega* (1998) 19 Cal.4th 686, 692 [80 Cal.Rptr.2d 489, 968 P.2d 48]; *People v. Ausbie* (2004) 123 Cal.App.4th 855, 859 [20 Cal.Rptr.3d 371] (*Ausbie*).) We further agree with the People that assault with a deadly weapon or by means of force likely to produce great bodily injury is not an offense necessarily included in aggravated mayhem.

As noted earlier, section 205 provides that "[a] person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. . . ." Assault with a deadly weapon or by means of force likely to produce great bodily injury, by contrast, is proscribed in section 245, subdivision (a)(1) as follows: "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison. . . ." Applying the elements test to these two offenses, the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury is not a lesser included offense of aggravated mayhem because the disfiguring injury or disability may be inflicted without the use of a deadly weapon or by use of force not necessarily likely to cause great bodily injury. (See *Ausbie, supra*, 123 Cal.App.4th at pp. 860–862.)

■ Moreover, even if we apply the accusatory pleading test, which is usually used "to determine whether to instruct a jury on an uncharged lesser offense [citations]" (*Montoya, supra*, 33 Cal.4th at p. 1035), we reach the same conclusion because such test does not assist Quintero in this case. Generally,

the accusatory pleading test looks to whether " ' " 'the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified [some] lesser offense is necessarily committed.' [[C]itation.]" ' " (*Ibid.*) In doing so, "we consider *only* the pleading for the greater offense." (*Id.* at p. 1036.)

Here, the greater offense of aggravated mayhem was alleged in count 1: "On or about December 25, 2002, [Quintero] did unlawfully, and under circumstances manifesting extreme indifference to the physical and psychological well being of another, intentionally cause permanent disability and disfigurement and deprivation of a limb, organ and body member of [Barajas], a human being, in violation of [s]ection 205." The pleading does not allege that the permanent disability and disfigurement was accomplished by means of a deadly weapon, or by force likely to produce great bodily injury. Thus the pleading for the greater offense of aggravated mayhem does not include the lesser offense of assault with a deadly weapon or by means of force likely to produce great bodily injury. (See *Ausbie, supra*, 123 Cal.App.4th at p. 863.) The fact that count 1 also alleged a sentencing enhancement for the use of a deadly weapon, "to wit: a razor blade knife," does not change this determination as such allegations are not properly considered to be part of the accusatory pleading and may not be used in determining lesser included offenses. (*People v. Toro* (1989) 47 Cal.3d 966, 972 [254 Cal.Rptr. 811, 766 P.2d 577], disapproved on other grounds in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3 [76 Cal.Rptr.2d 239, 957 P.2d 928].)

Quintero's reliance on *People v. De Angelis* (1979) 97 Cal.App.3d 837 [159 Cal.Rptr. 111] and the fact the trial court here instructed on assault as a lesser offense of aggravated mayhem is misplaced. As the court in *Ausbie, supra*, 123 Cal.App.4th 855 correctly noted, *De Angelis* is factually inapposite to a case like this involving the lesser offense of aggravated assault. (*Ausbie, supra*, at p. 860.) Further, simple assault, which is a lesser included offense of aggravated mayhem and for which the court here instructed, is not the same as the aggravated assault offense involved in this case for which Quintero was convicted.

In conclusion, under either test, the aggravated assault is not necessarily included within the offense of aggravated mayhem. We therefore only reverse the conviction on count 6 and direct the court to modify the abstract of judgment accordingly.

## DISPOSITION

The count 6 conviction is reversed and the remaining convictions are affirmed as modified to correct the sentence imposed for the count 4 robbery. The superior court is directed to amend the abstract of judgment to reflect the modified sentence and reversal and to forward a copy of the amended abstract to the Department of Corrections.

McConnell, P. J., and Aaron, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 19, 2006, S141395.