Filed 6/24/13  P. v. Talavera CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>VERONICA ESTELA TALAVERA,<br><br>        Defendant and Appellant. | B240366<br><br>(Los Angeles County<br>Super. Ct. No. MA053354) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Charles A. Chung, Judge.  Affirmed as modified.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Seth P. McCutcheon, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Veronica Estela Talavera (defendant) appeals from a judgment of conviction of five felony counts. She challenges two counts, attempted murder and aggravated mayhem, claiming those convictions were not supported by substantial evidence. Defendant also requests a review of the sealed transcripts of the trial court's hearing on her *Pitchess* motion.[1] Respondent asks that we correct the judgment to reflect the true amount of mandatory fees to be paid by defendant. After reviewing the entire record including the sealed transcripts we conclude that substantial evidence supports the verdicts and that the trial court properly exercised its discretion in ruling on defendant's *Pitchess* motion. Finding respondent's contentions regarding fees to be well taken, we modify the judgment accordingly, and otherwise affirm.

## BACKGROUND

### 1. Procedural history

Defendant was charged with five felony counts relating to the beating of Douglas Draper (Draper) in his home on July 4, 2011. Count 1 charged defendant with the attempted willful, deliberate, and premeditated murder of Draper in violation of Penal Code sections 664 and 187, subdivision (a).[2] Count 2 charged her with torture in violation of section 206, and count 3 charged her with aggravated mayhem in violation of section 205. Count 4 charged defendant with attempted first degree residential robbery in violation of sections 664 and 211, and in count 5 with criminal threats in violation of section 422. The information specially alleged as to counts 1, 2, and 3 that in the commission of those crimes defendant personally used a blunt object and shards, deadly and dangerous weapons within the meaning of section 12022, subdivision (b)(1); and that in the commission of counts 1 and 4, defendant personally inflicted great bodily injury on Draper, within the meaning of section 12022.7, subdivision (a).

---

[1]     See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); Penal Code sections 832.7 and 832.8; Evidence Code section 1043 through 1045.

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

A jury convicted defendant of all counts as charged and found the special allegations true. On April 5, 2012, the trial court sentenced defendant to life in prison plus four years comprised of three years for the great bodily injury and one year for the use of a deadly weapon. The court imposed a concurrent life term with a one-year enhancement for the use of a deadly weapon, and stayed that term pursuant to section 654; and another life term for count 3, plus one year for the deadly weapon, also stayed pursuant to section 654. The court imposed and stayed a 10-year term for count 4, comprised of the high term of six years for attempted robbery, plus three years for the great bodily injury and one year for the use of a deadly weapon. As to count 4, the high term of three years for criminal threats was also stayed pursuant to section 654. The court ordered defendant to pay victim restitution and mandatory fines and fees, and to provide impressions and DNA. Defendant's presentence custody credits were 308 days, consisting of 268 actual days and 40 days of conduct credit.

Defendant filed a timely notice of appeal from the judgment.

## 2. Prosecution evidence

In July 2011 Draper was a retired, 61-year-old widower. He testified he owned a three-bedroom home where he lived with two roommates. In June 2011, a neighbor asked Draper to allow defendant to stay with him for a few days. Draper had not met defendant and knew nothing about her, but the middle bedroom next to his was not occupied, and he agreed to allow defendant to stay with him as a favor to his friend. After two weeks defendant was still there. She did not pay rent, but occasionally gave Draper small amounts of methamphetamine to smoke.[3]

Defendant became a problem for Draper: she repeatedly had late night or overnight guests; she painted a dresser that belonged to Draper; things went missing, such as knick-knacks, boxes, and hand tools; a sort of manifesto was written on the mirror; and Draper suspected that defendant was selling drugs. More than once during her stay,

---

[3]     Draper denied he was an addict, claiming he merely enjoyed methamphetamine occasionally for the energy boost.

3

Draper told defendant that the late night visits needed to stop, that he did not want the police to come, and that she should see her friends elsewhere.

One of defendant's friends, whom he knew only as "Roach," made Draper uncomfortable. On the night of July 3, 2011, Roach came to visit defendant sometime after 10:30 p.m., which Draper considered late. At 11:30 p.m., Draper had enough; he knocked on defendant's door, told them to finish their business and get on their way. When there was no answer, Draper knocked on the door again and loudly said, "Hey, you got to get goin', Roach."

When Roach failed to leave, Draper went to defendant's door a third time, opened the door and told defendant that Roach had to go or both of them had to go. Roach remained on the bed and defendant urged him to stay. Draper then told her he was going to call the police. Draper turned to walk away when suddenly "blows started raining down" on his head. He saw a blurry object resembling a hammer hit him repeatedly on the head and shoulders. He turned and saw defendant was hitting him with a wooden dowel. Although Draper tried to block her blows with his arm, she was too quick, and struck him in the head and shoulders about a dozen times, causing him to bleed. Draper backed down the hallway intending to escape out the front door but defendant followed him, placed herself between Draper and the front door, and continued to hit him with the dowel. When Draper backed toward the kitchen, defendant followed, continually striking him, and leaving a trail of blood spatter on the floors and the wall outside the kitchen.

In the kitchen, defendant found a fan motor on a work bench there, dropped the dowel, and threw the motor directly at Draper's face. Draper managed to elude the motor enough to avoid it hitting him in the face, but it still clipped the side of his head and caused him to lose his balance. He landed on the work bench, overturned it and fell to the floor. By the time Draper got up, defendant had picked up a drop light and struck him with it on his head and shoulders. Defendant then said, "If you go to your room, I'll quit hitting you." Draper complied, and as he passed the front door on his to way his room, defendant placed herself between him and the door.

Draper reached his room and lay on the bed, feeling too weak to close or lock the door and fearful that doing so might further aggravate defendant. After a short while, defendant entered and said that Draper owed her money and demanded his debit card and pin number. When Draper told her he did not know where it was, defendant became more angry and broke a plate over his head. Using a shard from the broken plate, defendant stabbed Draper in the left shoulder, asked questions, and stabbed him again when she did not like the answers. Draper remembered only the stabs in the shoulder, although he thought she may have stabbed him in one other place. After asking for the key to the back door deadbolt defendant said, "I'm coming back to kill you in 30 minutes," left the room, closing the door behind her, which caused it to lock automatically. Draper was afraid and had no doubt that defendant would carry out her threat, but was uncertain what action to take so remained there for awhile. Draper heard defendant say, "Roach, go outside and check the windows. Make sure he can't get out." Draper then saw someone was outside running hands up and down through the venetian blinds. Draper could not see who it was.

Draper found his cell phone and called 911 at 1:27 a.m. on July 4, nearly two hours after the beating had begun. A recording of the 911 call was played for the jury. Among other things, Draper told the 911 operator: "She's beating me to death. Her name is Veronica"; "She's in another room"; and "She's just here in the house, she's beating me to death. I'm bloody from head to foot. She smashed me over the head over a dozen times. Hurry. I can't live much longer. Hurry."

Draper heard the sound of several keys being tried in his bedroom door lock from the outside, and tossed the phone over his shoulder to hide it. When defendant entered she appeared to know what he had been doing, called him a "snitch" and told him that she was going to cut both sides of his mouth open and cut out his tongue. Holding a coil of rope, she threatened to tie him up with it, but she hit him with it instead. Defendant then left the room after saying, "I'm coming back to finish up what I started."

It then became quiet for a few minutes until Draper heard knocking at the front door. He was afraid to get up to answer, but when the knocking turned to pounding, he

crawled to the door, opened it, saw the paramedics and Sheriff's deputies, and collapsed onto the porch. Draper was taken to the hospital emergency room, where his cuts were stitched and 30 staples were used to close his scalp wounds. A week to 10 days after the beating, Draper lost vision in both eyes for a few seconds, and although the sight in his right eye soon came back, he never regained vision in his left eye. At the time of trial he had not sought medical attention for the blindness because he had no money. Draper was left with scars on his shoulder and head.

Los Angeles Deputy Sheriffs Carr and Zeko arrived at Draper's house at 1:30 a.m., within minutes after the 911 call. Deputy Carr testified that because they had not been told the emergency was life-threatening, they knocked on the door and then waited outside for a few minutes after hearing a woman's voice saying, "Hold on. I'm in the bathroom." After they knocked again several times Draper opened the door and collapsed on the front porch, covered in blood. The deputies found a lawn chair against the wall outside defendant's bedroom window, which was open with the screen removed. No suspect was found after a search of the neighborhood.

Detective Randy Megrdle spoke to Draper in the hospital. He testified that Draper appeared to be tired, dazed, and in extreme pain. Draper later identified defendant's photograph without any doubt or hesitation.

Detective Megrdle arrested defendant July 14, 2011. After defendant waived her *Miranda* rights,[4] she told the detective she worked as Draper's caretaker, providing cleaning and cooking, but moved out on July 1 because Draper allowed a drug dealer to live there. She claimed she then went to stay with her sister Monica Arriaga (Arriaga), who would confirm this, and had not been back to Draper's house.[5]

---

[4]     See *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445.

[5]     Arriaga and her daughter Angela Valdez (Valdez) both testified that defendant arrived sometime during the Fourth of July weekend but they were not sure it was on July 4th. When Arriaga denied having told the prosecutor that defendant arrived on July 4th, a recording of the conversation was played for the jury and they heard Arriaga tell the prosecutor five times that defendant arrived on the Fourth of July.

After interviewing defendant, Detective Megrdle and his partner Detective Ellis immediately went to the restaurant where Arriaga worked.  Arriaga said that defendant did not arrive July 1, but came to stay with Arriaga on July 4.  Detective Megrdle also spoke with Valdez who told him she was certain that defendant came to her workplace on Monday, the Fourth of July holiday.  Detective Megrdle testified that neither Arriaga nor Valdez showed any confusion about when defendant arrived.

Defendant waived her right to testify and presented no evidence.

## DISCUSSION

## I.  Substantial evidence standard of review

Defendant contends that her conviction of attempted murder and aggravated mayhem, are not supported by substantial evidence.  We review both contentions under the same standard.  When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)  We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence.  [Citation.]"  (*Ibid*.)  We do not reweigh the evidence or resolve conflicts in the evidence.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## II.  Intent to kill

Defendant contends that her murder conviction must be reversed because no substantial evidence supported a finding that she intended to kill Draper when she attacked him.

7

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

A threat to kill the victim is one circumstance that may be considered with other evidence to show that the defendant harbored an intent to kill. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 757; *People v. Lee* (1987) 43 Cal.3d 666, 679.) Prior disagreements are also relevant. (See *People v. Cartier* (1960) 54 Cal.2d 300, 311.) Multiple blows to the head and body with a deadly weapon support an inference of an intent to kill the victim. (*People v. Cain* (1995) 10 Cal.4th 1, 39.) Such an inference may be further supported by evidence of trapping the unarmed victim to facilitate the attacks. (See *People v. Avila* (2009) 46 Cal.4th 680, 701-702.) Pursuing a victim to attack him with a deadly weapon while he attempts to flee is also indicative of an intent to kill. (See *People v. Richmond* (1991) 2 Cal.App.4th 610, 618 [hatchet].)

Substantial evidence of all such circumstances was presented here, despite defendant's claim that "at no time, did she take any step toward killing Draper, even though she had ample opportunity." Such steps began with a sudden attack from behind with multiple blows to the head by means of a deadly weapon; defendant then pursued Draper as he attempted to flee and blocked his escape through the front door as she repeatedly struck him with the dowel; she picked up the fan motor when she dropped the dowel, threw it directly at Draper's face, grazed his head with it, and caused him to fall; as soon as he stood, she struck him with a third weapon, the drop light; and then, when Draper was too weak and frightened even to close the door, she hit him on the head with a ceramic plate, stabbed him repeatedly with a shard, and struck him with a coil of rope as he lay on the bed.

The crux of defendant's argument appears in her conclusion that her "acts and statements were consistent with an intent to inflict pain and injury, rather than an intent to

take a person's life." In support of her conclusion, defendant points to evidence suggesting that the attack was a mere lashing out in anger without a motive to kill Draper; and she argues that the fact that she did not kill him although she had the time and opportunity to do so demonstrated a lack of intent to kill. Defendant argues that "if [she] had intended to kill Draper, she would have chosen a method that would have accomplished this objective" or she would have targeted a vital organ.

We reject defendant's implication that the facts were inconsistent with a finding of intent to kill. The fact that the defendant was unsuccessful in killing Draper and fled before she could "finish the job" does not necessarily mean that she lacked the intent to kill him. (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945 [neither abandonment after one shot nor poor marksmanship necessarily establishes a less culpable state of mind].) Further, when defendant was unsuccessful with one weapon, she tried choosing another. Searching for a more effective weapon is indicative of a an intent to kill. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1129 [search for second knife after first knife broke].) Moreover, defendant stabbed Draper more than once in his left shoulder, suggesting that she may have been aiming for his heart and tried again when she missed. (Cf. *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552 [multiple stabbing on left side].)

Moreover, the existence of conflicting inferences would not compel reversal. "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]' [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

We conclude that ample substantial evidence supported the jury's finding that defendant harbored an intent to kill when she attacked Draper or that she formed the intent sometime before the attack ended.

## III. Aggravated mayhem

### A. *Specific intent*

Defendant contends that her conviction of aggravated mayhem must be reversed due to a lack of substantial evidence to support a finding that she intended to maim or disfigure Draper.

"A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body."  (§ 205.)[6]  "Aggravated mayhem is a specific intent crime which requires proof the defendant specifically intended to cause the maiming injury, i.e., the permanent disability or disfigurement.  [Citation.]"  (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162 (*Quintero*).)  "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.  [Citations.]"  (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

Evidence of specific intent may be sufficient where the "circumstances show defendant's attack was the product of deliberation and planning."  (*People v. Park* (2003) 112 Cal.App.4th 61, 70 .)  "However, where the evidence shows no more than an 'indiscriminate' or 'random' attack, or an 'explosion of violence' upon the victim, it is insufficient to prove a specific intent to maim.  [Citation.]"  (*Quintero*, *supra*, 135 Cal.App.4th at p. 1162, quoting *People v. Lee* (1990) 220 Cal.App.3d 320, 326 (*Lee*).)  "[S]pecific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately.  [Citation.]"  (*People v. Ferrell* (1980) 218 Cal.App.3d 828, 835 (*Ferrell*).)  Such circumstances may be those "attending the act, the manner in which it is

---

[6]     The more general word, "maim" is a common abbreviation for either type of mayhem:  infliction of a permanent disability or disfigurement.  (See *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831.)

done, and the means used, among other factors. [Citation.]" (*Id.* at p. 834.) "Thus evidence of a 'controlled and directed' attack or an attack of 'focused or limited scope' may provide substantial evidence of such specific intent. [Citation.]" (*Quintero, supra*, at p. 1162, quoting *Lee*, *supra*, at pp. 325-326.)

Defendant contends that the circumstances of this case are analogous to cases in which the evidence showed no more than a sudden indiscriminate, random, or unfocused attack, such as *People v. Sears* (1965) 62 Cal.2d 737, 740-741 (*Sears*), where the victim got in the way while the defendant was attacking her mother with a pipe; and *People v. Anderson* (1965) 63 Cal.2d 351, 356 (*Anderson*), where the defendant became enraged and stabbed the victim over 60 times over her entire body; and *Lee*, *supra*, 220 Cal.App.3d at page 326, where the defendant suddenly punched his neighbor three times without any conceivable reason, leaving him partially paralyzed. The cited cases are not analogous. In contrast to *Sears*, Draper was not the unintended victim of blows aimed at another; and in contrast to *Anderson*, defendant's attack was focused on Draper's head and face, and later his head and shoulder. Finally, although defendant apparently exploded in violence like the defendant in *Lee*, her attack was not random or without any apparent reason.

Pointing out various cuts and marks on other areas of Draper's body, defendant contends that there was no evidence that the attack was focused on Draper's eyes or facial area. We disagree. Scratches on Draper's feet appear to be minor and the cuts on his hands were most likely caused when he attempted to block the blows to his head; however, photographs taken after the attack show three wounds requiring staples over Draper's right eyebrow and one wound requiring staples just above Draper's left temple. Further, defendant threw the fan motor directly at Draper's face and she broke a ceramic plate over Draper's head. The blows with the dowel were focused almost entirely on his head and were close enough to his face to indicate an attempt to disfigure or permanently disable him. Stabbing Draper's left shoulder with a shard from the plate may have been a *change* in her focus, but did not transform the earlier blows from the dowel and plate into a random, generalized, or unfocused assault.

11

Defendant next contends that the evidence does not support a finding that she intended to cause Draper's blindness because she did not make a statement to that effect and there was no medical expert testimony to prove which blow caused the blindness. The contention lacks merit. Although a statement of intent would have provided direct evidence of defendant's state of mind (*People v. Karis* (1988) 46 Cal.3d 612, 636, fn. 17), such direct evidence is rare and intent must usually be shown by the circumstances surrounding the crime. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27; *People v. Bloom, supra,* 48 Cal.3d at p. 1208 ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction"].) In addition, Draper testified that he lost his vision a week to ten days after the attack and that the vision loss was caused by the beating. Seven months after the attack, he still had no sight in his left eye. In the absence of evidence to the contrary, such testimony by the victim is sufficient proof without medical testimony that permanent blindness resulted from an injury inflicted by the defendant. (*People v. McWilliams* (1948) 87 Cal.App.2d 550, 551-552.)

We conclude from such evidence that the jury could reasonably infer that defendant intended to disable Draper's vision by focusing the dowel strikes on his head, aiming a fan motor directly at his face, and causing severe cuts close to both eyes.

## B. *Permanent disfigurement*

"To prove mayhem based on a disfiguring injury, the injury must be permanent. [Citations.]" (*People v. Hill* (1994) 23 Cal.App.4th 1566, 1571.) While not every visible scar is disfiguring, a jury could reasonably find that a permanent scar on the face, head, or other part of the body constitutes a disfigurement even if it is only a few inches long. (*People v. Newble* (1981) 120 Cal.App.3d 444, 447, 452-453 [three-inch facial laceration extending from the bottom of ear to just below chin].) Whether a scar is a permanent disfigurement is a question for the trier of fact. (*People v. Park* , *supra*, 112 Cal.App.4th at p. 72.)

Arguing that the scars might fade over time, defendant contends that the evidence was insufficient to demonstrate that Draper's scars amounted to a "permanent disfiguring

injury" as defined in section 205 and *People v. Newby* (2008) 167 Cal.App.4th 1341, 1347 (*Newby*). The phrase "permanent disfiguring injury" is not defined in the statute as defendant claims. In *Newby*, the appellate court construed "permanent" as used in section 205, concluding that it did "not necessarily mean irreparable" and that a "'disfiguring injury may be permanent even if it can be repaired by medical procedures.' . . . [Citation.]" (*Newby*, *supra*, at pp. 1347-1348.) *Newby* does not address the adequacy of the record or the possibility that a scar might fade over time.

Defendant contends that the "lack of information as to the size and nature of these scars makes it doubtful that they were permanent." She suggests that we must infer from this "lack of information" that all Draper's scars were minor or barely visible and thus conclude that there was insufficient proof of an intent to cause permanent injury. To support her contention, defendant points to the prosecutor's comments that the scars on Draper's head were barely visible and to the absence in the record of descriptions of the other scars. Contrary to defendant's suggestion, a reviewing court does not presume error from a silent record: "'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Here the jury was given the opportunity to view the scars on Draper's head and arm when he approached the jury box and walked alongside it for that purpose. The trial court instructed the jurors to raise their hands if unable to see the scars, and as there is no indication in the record that any of them raised a hand, we presume that each juror was able to view the scars sufficiently to make a finding. Indeed, defense counsel did not object, add any description of his own, or ask that the record reflect an absence of visible scars; and he made no mention of scars or the absence of scars in closing argument, even after the prosecutor had already argued: "[Defendant] disfigures him by putting all those scars on him. He will live with those scars forever. The few on his head are a little hard

13

to see but you can see -- clearly see the ones on his arm that he will have for the rest of his life."**7**

As the jurors, the prosecutor, and even defense counsel were satisfied with their observation of the scars, we reject defendant's claim that there was a "lack of information"; and we decline to reject the inferences drawn by the jurors from their own observations.

## IV. *Pitchess* motion

The trial court granted defendant's *Pitchess* motion for discovery of relevant evidence contained in the personnel files and other confidential records pertaining to Detective Megrdle. (Pen. Code, §§ 832.7, 832.8; Evid. Code, §§ 1043-1045; see *Pitchess, supra*, 11 Cal.3d 531.) In granting the motion, the trial court limited its review to records relevant to any alleged dishonesty. After an in camera review, the trial court ordered the discovery of two documents and issued a protective order to maintain the confidentiality of the records. The trial court subsequently granted a supplemental *Pitchess* motion, and after an in camera hearing, ordered the discovery of a handwritten witness statement.

Defendant requests a review of the trial court's determination that there were no additional discoverable items in the records produced.

We review the trial court's determination for an abuse of discretion. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.) The records produced in the trial court were not retained, but the sealed transcripts of the in camera hearings demonstrate that either the custodian of the records or the trial court described them and the court examined each one. We thus find the transcript sufficiently detailed to review the trial court's discretion. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229.) Upon review of the sealed record of the in camera proceedings we conclude the trial court properly exercised its discretion in determining that the documents produced complied

---

**7** The trial judge declined an offer to view Draper's scars and thus did not describe them.

with the scope of the *Pitchess* motion, and that no additional documents or information should be disclosed to the defense.

## V. Correction of assessments and fees

Respondent asks that we correct the judgment to reflect the appropriate imposition of a $30 court facilities assessment as to each count (Gov. Code, § 70373, subd. (a)(1)) and a $40 court security fee as to each count (§ 1465.8, subd. (a)(1)). Defendant has not opposed the request and we find it appropriate.

The trial court ordered defendant to pay $70 in fees without specifying the fee or breaking the total into individual fees. The abstract of judgment states that the court ordered payment of a court security fee in the amount of $80 and a criminal conviction assessment in the amount of $60. The trial court should have imposed a $40 court security fee and a $30 court facilities assessment as to each of the five counts of which defendant was convicted, even the counts stayed under section 654. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483-485.) In addition, the court should have provided a detailed recitation of each fee and set forth the correct amount in the abstract of judgment. (*People v. High* (2004) 119 Cal.App.4th 1192, 1200-1201.) As these are mandatory provisions, we may correct the order on appeal in the first instance. (*People v. Talibdeen* (2002) 27 Cal.4th 1151, 1153-1154.)

**DISPOSITION**

The judgment is modified to reflect the imposition of a court security fee in the amount of $40 as to each of the five counts, for a total of $200, and a criminal conviction assessment in the amount of $30 as to each count, for a total of $150. The trial court is directed to prepare an amended abstract of judgment in accordance with this disposition and deliver it to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

16