Filed 3/21/16  P. v. Arana CA1/2
Order modifying opinion filed 2/29/16

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>OSCAR ARANA,<br><br>        Defendant and Appellant. | A139425<br><br>(San Francisco County<br>Super. Ct. No. 215367) |

BY THE COURT:

It is ordered that the opinion filed herein on February 29, 2016, be modified as follows:

On page 18, in the third line of the first full paragraph, delete the sentence and first word of the following sentence that reads:  "Nothing in the trial below focused on the specific intent to disfigure; this theory was never raised.  Instead,"

The following sentence should now read:   "The trial was focused on the specific intent to disable."

The petition for rehearing is denied.  This modification does not change the judgment.

Dated:_____                    _____

                                                                                  Kline, P.J.

1

Filed 2/29/16  P. v. Arana CA1/2 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>OSCAR ARANA,<br><br>　　　　Defendant and Appellant. | A139425<br><br>(San Francisco County<br>Super. Ct. No. 215367) |

Defendant Oscar Arana was convicted by a jury of aggravated mayhem and assault with a deadly weapon after an alcohol-fueled knife attack, following the San Francisco Giants' 2010 World Series victory parade, left his victim paralyzed from the chest down.  Defendant does not challenge his conviction for assault, but raises several contentions of error with respect to the aggravated mayhem conviction.  He argues the evidence was insufficient to support the conviction; the court should have instructed the jury on attempted aggravated mayhem; the disfigurement element was unconstitutionally vague; the court erred in answering a jury question and in refusing to strike a portion of the probation report; and if any of the foregoing arguments was not preserved for appeal, his trial counsel provided inadequate representation.  We find no prejudicial error and will affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

By information amended on March 12, 2012, the San Francisco District Attorney charged defendant with committing three offenses during a November 3, 2010, assault on Jorge Alvarado.  Count 1 charged attempted murder in violation of Penal Code

1

sections 664 and 187, subdivision (a),[1] and alleged the infliction of great bodily injury (§ 12022.7, subd. (b)) and personal use of a deadly weapon (§ 12022, subd. (b)(1)). Count 2 charged aggravated mayhem in violation of section 205 and alleged the personal use of a deadly weapon (§ 12022, subd. (b)(1)). Count 3 charged assault with a deadly weapon, a stabbing instrument, in violation of section 245, subdivision (a)(1), and alleged the infliction of great bodily injury, specifically permanent paralysis (§ 12022.7, subd. (b)).

The jury trial began on June 6, 2013.

*Prosecution Case*

On November 3, 2010, around 9:00 p.m., Jorge Alvarado, his cousin Luis Alvarado, and their mutual friend Christopher So were heading home from San Francisco's Chinatown. Near Union Square, they saw people they knew standing on the steps near the fountain outside the Levi's store at the corner of Stockton and Post Streets. Defendant, then 20 years old, was with the group. Jorge[2] knew him because they went to high school together and hung out with the same people. Luis and Christopher were also acquainted with defendant. Christopher greeted defendant amiably. He recalled that defendant was " 'drunk as fuck.' " No one else appeared drunk to him.

As they arrived, Jorge saw defendant trying to pick a fight with someone for about 5 to 10 seconds before others in the group stepped in to calm defendant down, and the other man walked away. Jorge could tell defendant was drunk, and he thought that was why defendant had been aggravating the other man.

Defendant then asked Jorge "where [he, Jorge] was from." The question was strangely assertive, and Jorge did not know if defendant was trying to pick a fight or did not recognize him. Jorge jokingly answered, " 'City College,' " where he and defendant had taken a gym class together. Jorge testified that this line of conversation ended: "I

---

[1] All further unspecified statutory references are to the Penal Code.

[2] Several individuals involved in this case have the same last names. For clarity and readability, and meaning no disrespect, we will refer to most witnesses by their first names.

think once he saw that I wasn't going to continue with that type of conversation he just dropped it." Jorge then greeted defendant: ". . . in a playful manner I was like, 'what's up, bitch ass nigga?' " Defendant did not react; he just looked at him blankly. Jorge was not afraid of defendant or concerned for his safety.

Later, defendant offered Jorge some liquor from a water bottle. Jorge drank some and discovered it was just water. "So I called him [defendant] stupid for that, and everyone else laughed. And I guess he got mad and left from there. I didn't see him."

Shortly thereafter, Jorge heard defendant call out his nickname, "Goofy." Jorge turned, and defendant approached him quickly from behind, coming down the steps of the plaza. With a clenched fist, defendant hit Jorge several times in the upper back using a "cuffed slightly over hand" motion and a hook, as in boxing. Jorge felt like he was being punched three times in quick succession. After the fourth blow, he fell to the ground, down the steps. He remembered not being able to get up; he could not move his legs.

As Jorge fell, defendant stood on the steps with a clenched fist for about 15 seconds. He looked "kind of angry, kind of aggravated." Christopher asked defendant, "What are you doing?" Defendant did not respond and quickly left the scene.

The punches actually were stabs, one of which almost completely transected Jorge's spinal cord, causing lower limb paralysis. When Jorge woke up in the hospital, he could not move any part of his body below his chest. He had three stab wounds to the left upper back and one in the left armpit. Jorge also had pain in his left leg that went away with medication. Jorge spent six weeks in the hospital. He was still taking pain medication at the time of trial.

Photographs showing Jorge's scars and a ruler were admitted into evidence. The top two scars on his back were "v" shaped; the lower scar on his back and the scar in his left armpit were straighter.[3]

_____

[3] Jorge's medical records indicated that the stab wound to his armpit was four centimeters long; the "top" stab wound to his back was approximately five by three

*Defense Case*

On November 3, 2010, after attending the San Francisco Giants' World Series victory parade, defendant's girlfriend, Monica Hernandez, persuaded defendant to go out with her that evening to continue celebrating. Defendant testified that he was tired from working that day but agreed to go out. He showered, put on clean clothes, and transferred items from the pockets of his work pants, including a cell phone, wallet, keys, and a folding knife with a blade about three inches long. Monica told defendant she wanted to drink, so defendant purchased two 24-ounce cans of beer and a gallon of Bacardi rum. They poured the rum into water bottles. Monica called her friends and arranged to meet in San Francisco. Defendant and Monica took a bus downtown around 5:00 p.m. Defendant drank two 12-ounce beers before they left, and drank the two 24-ounce cans of beer on the bus. Monica brought the rum.

Defendant and Monica arrived at the meeting place around 6:00 p.m. When they got off the bus, defendant bought a six-pack of beer at a liquor store. While they waited for Monica's friends, defendant drank the entire six-pack. Eventually, defendant's friends and Monica's friends arrived. At some point, defendant went to a different liquor store and bought two 24-ounce beers for himself. He made at least three more trips to that liquor store to get more beer. He also began taking gulps of rum from the water bottles.

At some point, defendant saw his father who was out with his two cousins. All three of them looked drunk. Defendant and his father went to the liquor store where defendant had made most of his beer purchases. The clerk had stopped selling alcohol to defendant, so defendant's father bought him at least two more 24-ounce cans of beer. Defendant's father testified that he and his cousins had been drinking heavily that evening, and they bought defendant, who was also drunk, four 16-ounce cans of beer.

centimeters; the "medial one" was approximately three by two centimeters; and the "lowest one" was approximately two centimeters.

4

Defendant testified that did not recall seeing Jorge, Luis, or Christopher that night. Defendant knew Jorge during high school and took a gym class with him at City College. There was no bad blood between them. Defendant knew Jorge's nickname was Goofy. Defendant did not remember asking Jorge, " 'Where you from?' " Defendant testified that, if he were sober, there would be no reason for him to ask Jorge that question. Defendant did not remember Jorge saying, " 'What's up, bitch ass nigga?' " Defendant would have considered that a joke if Jorge had said it when defendant was sober. Defendant did not remember anyone saying he was stupid for drinking so much. He had been drunk around these same people before, and it would not have bothered him if they told him he was drunk. Defendant did not remember picking a fight with another man and his friends trying to calm him down. He did not remember calling out "Goofy," or pulling out his knife or stabbing anyone. He did not remember going home that night.

Defendant admitted that he was responsible for Jorge's paralysis, but denied intending to harm him in any way. There was no reason for defendant to try to kill Jorge or paralyze him. The last thing defendant remembered from that night was "chug[ging] a water bottle full of rum" as his friends chanted, " 'chug, chug, chug.' " The next thing defendant remembered was waking up around 5:00 a.m. feeling sick and hung over.

Defendant did not know what happened to his knife. The last time he remembered having it was around 4:00 p.m. on the day of the incident, when it was in his pants pocket. Defendant did not remember taking out the knife and using it that night.

Monica largely corroborated defendant's version of events leading up to defendant's altercation with the passerby. She testified that defendant smoked marijuana in addition to drinking beer. Monica spent the time with her friends Camille and Caroline, and did not pay attention to what the men were doing.

At some point, raised voices got Monica's attention. Apparently, defendant was drunk and wanted a cigarette. The person who passed by defendant did not want to give him a cigarette, and defendant argued with him. Monica testified that she was not there to babysit, so she let the men deal with the situation. Later, Monica heard yelling again, but she did not turn to look because she thought defendant was getting into another

5

argument. She heard more yelling and ignored it. When the yelling continued, she turned and saw Jorge on the steps.

As Jorge lay on the steps, defendant just stood there with a blank expression on his face for 15 or 30 seconds. It was clear that Jorge was injured. Monica did not want any problems because she "had [her] daughter at home, so [she] grabbed [defendant] and said, 'Let's go home.' "[4] As Monica led defendant out of the area and to the bus stop, defendant was falling asleep and leaning on her. He continued falling asleep during the bus ride and did not say anything. When they got off the bus, defendant had trouble walking. Monica helped him into the house. He went straight to bed and slept until the next morning.

Defendant admitted that he was an alcoholic. In 2006, after drinking heavily at school, he had been taken to the hospital, but he had no memory of the event. He was required to complete a substance abuse program at the Youth Guidance Center, but he did not take the program seriously. In 2009, he was convicted of driving under the influence. In the months leading up to the incident, defendant routinely drank a couple of beers every other day during the week and got drunk on the weekends. At least half the time defendant drank alcohol, he could not remember the previous evening. He had been getting drunk every weekend for about two or three years before trial.

Defendant's father testified about his own alcohol abuse, that he was an alcoholic, who got drunk every weekend. When defendant was a child, he often saw his father drunk. Defendant's father acknowledged being a bad example for defendant, whom he had seen drunk many times.

Dr. Paul Good, a clinical and forensic psychologist, testified as an expert in substance abuse. Dr. Good conducted a forensic evaluation of defendant, which included

---

[4] Monica met defendant when she was 14 and defendant was 17. She moved into defendant's family's home in the summer of 2009 when she was pregnant with defendant's child. Their child was born in March 2010. On the witness stand, Monica affirmed that she wanted to help defendant if she could and that she continued to live with defendant's parents after the incident.

taking a family history concerning alcoholism in defendant's family, interviewing defendant and Monica, reading police reports, witness statements and the preliminary hearing testimony, and conducting a psychological examination of defendant. Dr. Good also gave defendant tests to measure his honesty, which showed that defendant was not faking a disorder.

Dr. Good explained that a blackout is "a temporary but complete loss of memory due to a high blood alcohol level for a specific period of time while the person was intoxicated." "[D]uring the blackout the individual can remain alert, can interact, can appear to others to be functioning in some sense adequately, but later on, often the next morning, will have no memory of that slice of time from the evening before. [¶] They may have been perceiving things, but in a sense it wasn't recorded in memory. And so the next morning there is no memory." Blackouts occur when someone drinks a large volume of alcohol, especially when the alcohol is consumed quickly and on an empty stomach.

Dr. Good testified that he was comfortable accepting as true defendant's report that he experienced a blackout on November 3, 2010, on the bases that tests showed no evidence of malingering; Monica described defendant slurring his words and having trouble standing up that night; and defendant self-reported having been drinking heavily. Dr. Good opined that someone who consumed the amount of alcohol defendant drank that night would have compromised mental functioning and would have difficulty forming an intent to reach a specific outcome. The alcohol would affect the person's ability to perceive the situation, weigh the options, and "choose a legitimate option." It would not change Dr. Good's opinion to add facts such as, just prior to the stabbing, defendant was fighting with someone else, defendant had a two or three-minute conversation with Jorge Alvarado, defendant asked Jorge where he was from, Jorge and his friends had laughed at defendant about the water bottle incident, and defendant ran down some steps and called out Jorge's nickname just before stabbing him.

Dr. Good testified that someone who drank as much as defendant drank that night, but was still functioning, had adapted to that amount of alcohol. It was possible for an

7

alcoholic to have a high blood alcohol level and still perform fairly complex tasks. Dr. Good did not know what defendant's blood alcohol level was on November 3, 2010; he had never seen defendant under the influence of alcohol; and he had no history of treating defendant, having only met him two times for the forensic evaluation. Dr. Good conceded that someone who was drunk could get angry for a minor reason, realize he or she was angry, and intend to direct anger at his or her target.

In closing arguments, there was no dispute that defendant was intoxicated that night, he stabbed Jorge three times in the upper back and once in the armpit, and the stabbing left Jorge paralyzed from the chest down. On the aggravated mayhem charge, the prosecutor argued that the circumstances showed defendant intended to inflict the maiming injury when he stabbed Jorge and was not too drunk to form that intent. Defense counsel conceded the injuries defendant inflicted were "severe" and that defendant might be guilty of something, but argued defendant was so intoxicated that he did not have the specific intent for aggravated mayhem. Defense counsel argued the evidence showed "no more than a sudden indiscriminate and unfocused attack," "an action done by someone who would not have done that had he not been blind drunk." Defense counsel also emphasized that, to find defendant guilty of aggravated mayhem, the jury would have to find that he had the specific intent to maim and that there was "no other reasonable explanation."

On June 20, 2013, the jury found defendant guilty of assault with a deadly weapon and found true the allegation that defendant inflicted great bodily injury causing permanent paralysis. On June 24, 2013, the jury found defendant guilty of aggravated mayhem and found the personal use of a deadly weapon allegation true. The jury found defendant not guilty of attempted murder.

On July 31, 2013, the trial court imposed a sentence of eight years to life in prison for count 2, aggravated mayhem; and imposed and stayed a sentence of nine years in prison for count 3, assault with a deadly weapon.

Defendant filed a timely notice of appeal.

8

## II. DISCUSSION

A.    *The Sufficiency of the Evidence of Specific Intent for Aggravated Mayhem*

Defendant contends his conviction for aggravated mayhem must be reversed because there was insufficient evidence of specific intent, whether tested at the time he moved for acquittal on that basis pursuant to section 1118.1, or subsequently when both sides rested.[5]

*Factual Background*

At trial, defendant filed a motion for judgment of acquittal under section 1118.1 on the aggravated mayhem charge on the ground of insufficient evidence to prove the element of specific intent.  Defendant argued the prosecution failed to offer any evidence that defendant "harbored a specific intent to permanently disable [Jorge];" rather, it had proven only "a sudden and indiscriminate attack" committed while defendant was "extremely intoxicated," which "case law [made] clear [was] insufficient to support a conviction for aggravated mayhem."

The trial court denied defendant's motion, finding sufficient evidence of specific intent from evidence that defendant used a weapon and inflicted the wounds with a hooking motion; the wounds were all to the victim's upper and middle back and close together with one exception; defendant was being taunted and not respected; and the attack ended when Jorge fell down the stairs, the goal of disabling him having been achieved.  The trial court observed in denying the motion, "I'm aware of the fact that

---

[5] Defendant filed the section 1118.1 motion on June 18, 2013, and it was argued that day.  At that point in the trial, Dr. Good, defendant's expert witness, had not yet testified.  Nor had the prosecution completed its case in chief, since Dr. Rochelle Dicker, a trauma surgeon, did not testify until June 19, 2013 (after the defense had rested), per agreement of the parties that she could be called out of order to accommodate her schedule.  The prosecution rested on June 19, 2013, after Dr. Dicker's testimony.  The Attorney General argues that defendant's section 1118.1 motion for acquittal, brought before the close of evidence on either side, was premature and properly denied for that reason alone.  This argument was not raised below, and the trial court addressed the merits of the motion for judgment of acquittal.  But we need not address this issue because the sufficiency of the evidence to sustain the conviction, separate from the denial of defendant's motion for acquittal, is properly before us.

9

some of the cases involve what they believe to be sort of an explosion of violence or indiscriminate attack. And I think in this case one interpretation is that the attack was instead focused on a particular area for a particular purpose."

*Legal Principles*

Section 205 defines aggravated mayhem: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill. Aggravated mayhem is a felony punishable by imprisonment in the state prison for life with the possibility of parole."

"Aggravated mayhem is a specific intent crime which requires proof the defendant specifically intended to cause the maiming injury, i.e., the permanent disability or disfigurement." (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162 (*Quintero*).) *People v. Ferrell* (1990) 218 Cal.App.3d 828, 833 (*Ferrell*).) The specific intent to maim may not be inferred solely from evidence that the injury actually inflicted constitutes mayhem; rather, the circumstances attending the act, the manner in which it was done, and the means used, among other factors, may support an inference of intent to maim. (*People v. Park* (2003) 112 Cal.App.4th 61, 64; *People v. Lee* (1990) 220 Cal.App.3d 320, 325 (*Lee*).) Further, "evidence of a 'controlled and directed' attack or an attack of 'focused or limited scope' may provide substantial evidence of" a specific intent to maim. (*Quintero, supra,* 135 Cal.App.4th at p. 1162, quoting *Lee, supra,* 220 Cal.App.3d at p. 326.) Conversely, evidence showing "no more than an 'indiscriminate' or 'random' attack, or an 'explosion of violence' " is insufficient to prove the specific intent to maim. (*Quintero*, *supra*, 135 Cal.App.4th at p. 1162.)

" 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom,

there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.]" (*People v. Stevens* (2007) 41 Cal.4th 182, 200.) " 'We review that evidence in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. [Citation.]' [Citation.]" (*People v. Moncada* (2012) 210 Cal.App.4th 1124, 1132.)

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

*Analysis*

On the merits, defendant argues that "the evidence supports no more than a drunken, unexplained, indiscriminate attack," and that "the only explanation for the totally unanticipated explosion of violence" was the evidence presented by both parties of defendant's "extreme drunkenness."

Defendant compares the facts in this case to those in several others in which the specific intent element of aggravated mayhem was at issue. He argues cases such as *Ferrell*, *supra*, 218 Cal.App.3d at pages 835-836 and *Quintero*, *supra*, 135 Cal.App.4th at pages 1159, 1163, are distinguishable in that the attacks in those cases were focused and controlled. In *Ferrell*, the defendant calmly and deliberately shot the victim's father in the knee and then turned the gun on the victim, shooting her once in the neck before fleeing when she saw the victim was down. (218 Cal.App.3d at pp. 835-836.) In *Quintero*, the defendant held the victim by the hair as he cut the victim's face numerous times, saying "[f]uck you, fool," and asking "[h]ow do you like this?" (135 Cal.App.4th at pp. 1159, 1163.) Defendant also argues there was no antagonism between himself and Jorge, unlike the situation in *People v. Park, supra,* 112 Cal.App.4th 61, where the two groups engaged in an " 'out-staring fight' " and the hostility was evident as the defendant threatened the victim, obtained a knife sharpener to use as a weapon, confronted the victim's group and declared his gang affiliation, attacked the victim's face until he broke the victim's teeth and caused profuse bleeding, then ended the attack with another statement of gang affiliation. *Park* held that the circumstances showed the attack was "the product of deliberation and planning, not an explosion of indiscriminate violence." (*Id.* at pp. 65, 69-70.)

Rather, defendant contends, the facts here most closely resemble those of *Lee*, *supra*, 220 Cal.App.3d 320. In *Lee*, the victim, a man named Chu, testified that the defendant had been his neighbor for about three months during which time they had never had any problem with each other. One day, the defendant entered Chu's room uninvited, said "You know what to do," and proceeded to hit Chu in the face repeatedly with his fist, causing acute head trauma that left Chu partially paralyzed. Chu could think

12

of no reason why the defendant would hit him. (*Id.* at pp. 323-324.) The appellate court in *Lee* reversed the defendant's conviction for aggravated mayhem "because the evidence was insufficient to support a determination that defendant specifically intended to disable his victim permanently." (*Id.* at p. 322.) The court explained: "Defendant here did not shoot or stab his victim; instead he used his fists and his feet. Defendant punched his victim in the face three times. Defendant also kicked his victim at least twice somewhere on his body, but there was no evidence that the kicks were to his head. The evidence shows no more than a sudden, indiscriminate, and unfocused battering of [the victim's] body. While this evidence undoubtedly shows extreme indifference to [the victim's] physical well-being, it does not show a controlled, directed, limited attack . . . from which a jury could reasonably have inferred that defendant specifically intended to disable [the victim] permanently." (*Id.* at p. 326.)

Defendant's reliance on *Lee* and attempts to distinguish other aggravated mayhem cases are unavailing. The theory that the attack on Jorge was one of indiscriminate violence by an extremely intoxicated defendant was, arguably, one explanation for what happened. However, the substantial evidence standard of review requires that the facts be viewed in the light most favorable to the judgment, that any inconsistencies in the facts be resolved in favor of the prevailing party, and that we not reweigh the evidence. (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11.) Viewed favorably to the judgment, the evidence supports the inference that defendant harbored the specific intent to inflict the maiming injury. Defendant stabbed Jorge forcefully and repeatedly in a vulnerable part of his body, his upper back near the spinal cord, supporting a finding that the attack was controlled and focused and intended to inflict serious injury. Defendant's initial aggressive questioning of Jorge ("Where you from?"), Jorge's greeting to defendant ("What's up, bitch ass nigga?"), and defendant's angry reaction after Jorge called him stupid, support a finding that defendant was angry, and there was antagonism between the two men. Defendant called out Jorge's neighborhood nickname immediately prior to rushing down the steps toward him and stabbing him from behind multiple times, supporting a finding that defendant targeted him. When Jorge fell down the steps,

13

defendant stood there for some 15 seconds, watching, supporting an inference that defendant wanted to make sure he had achieved his objective of maiming Jorge. Defendant then left the scene immediately, and apparently discarded the knife, which was never found, suggesting his presence of mind and consciousness of guilt.

Further, defendant was able to fully present his defense of voluntary intoxication to the jury. He presented an expert witness, who conducted a forensic examination of defendant and testified regarding the effects of alcohol on a person's central nervous system and thought processes; the court instructed the jury on voluntary intoxication as relevant to deciding whether the defendant acted with specific intent; and defense counsel argued extensively in closing that the evidence supported a finding that defendant was too intoxicated to form the specific intent to inflict a maiming injury.

The jury rejected defendant's theory that he was too drunk to intend the harm he caused. Instead, the jury found defendant specifically intended to maim Jorge, a finding supported by substantial evidence.

B.    *Whether the Trial Court Erred in Refusing to Instruct on Attempted Aggravated Mayhem*

Defendant contends the trial court erred in refusing to instruct the jury on attempted aggravated mayhem. He argues his aggravated mayhem conviction should be reversed because the omission violated his Fourteenth Amendment due process right to present a complete defense.

*Factual Background*

Defendant asked for an instruction on attempted aggravated mayhem as a lesser included offense of aggravated mayhem. Defense counsel explained that his request was based on the notes to CALCRIM No. 800, the jury instruction for aggravated mayhem, which listed attempted aggravated mayhem, but not simple mayhem (§ 203), as a lesser included offense to aggravated mayhem. Defense counsel pointed out that simple mayhem "has its own lesser included of attempted mayhem, but [section] 203 is not listed under [section] 205 as a lesser included."

14

The court concluded the evidence did not support instructing on attempted aggravated mayhem and that the relevant lesser included offense was simple mayhem.[6] The court reasoned: "In this case you have a completed stabbing which results in disabling of Mr. Alvarado. So really as far as I see it, the only issue here is whether or not at the time of the stabbing [defendant] had the intent to disable, or whether he just had the general intent of stabbing . . . Mr. Alvarado in the back which ended up resulting in the kind of bodily injury described in [section] 203." The court focused on the specific intent to disable rather than the specific intent to disfigure. Other than unsuccessfully requesting the attempted aggravated mayhem instruction for the reason stated above, defense counsel did not dispute the court's reasoning in deciding not to give the attempted aggravated mayhem instruction. The court instructed the jury on aggravated mayhem and the lesser included offenses of simple mayhem (§ 203) and battery causing serious bodily injury (§ 243, subd. (d)).

The aggravated mayhem instruction given to the jury, CALCRIM No. 800, provided: "To prove that the defendant is guilty of [aggravated mayhem] the People must prove that, one, the defendant unlawfully and maliciously disabled or disfigured someone permanently. Two, when the defendant acted he intended to permanently disable or disfigure the other person. And, three, under the circumstances the defendant's act showed extreme indifference to the physical or psychological wellbeing of the other person."

During deliberations, the jury sent a note to the court asking, "In the context of aggravated mayhem, what is the definition of disfigurement? Are all stab wound scars disfigurements? Internal, external, cosmetic?" After conferring with counsel, the court provided the following response: "While not every scarring wound constitutes disfigurement in the context of aggravated mayhem, it is up to the jury to decide whether the injuries in this case constitute disfigurement."

---

[6] During the pendency of this appeal, *People v. Robinson* (2014) 232 Cal.App.4th 69, 79, held as a matter of first impression that simple mayhem is a necessarily included lesser offense of aggravated mayhem.

*Legal Principles*

" 'In criminal cases, even absent a request, a trial court must instruct on the general principles of law relevant to the issues the evidence raises. [Citation.] " 'That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]' " [Citation.] "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.]" ' [Citations.]" (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Appellate courts "apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

In a non-capital case, the erroneous failure to instruct on a lesser included offense is reviewed for harmless error under the state law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836-837. (*People v. Rogers* (2006) 39 Cal.4th 826, 867-868 (*Rogers*).) "Reversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of. [Citations.]" (*Id.* at p. 868.)

Further, the erroneous denial of a defendant's requested instruction that embodies the defense theory of the case may violate the defendant's federal due process right to present a complete defense. (See *Rogers*, *supra*, 39 Cal.4th at p. 872 [citing "cases in which federal courts have held that a trial court's failure to give a requested instruction (whether on a lesser included offense, or on some other subject) embodying the defense theory of the case and around which the defendant had built his or her defense, violated the defendant's due process right to present a complete defense"].)

16

*Analysis*

Defendant now contends the trial court should have instructed the jury on attempted aggravated mayhem on the theory that the jury reasonably could have found that although defendant had the specific intent to *disfigure* Jorge, the act of stabbing him did not result in *disfigurement* and, thus, was merely an attempt. (See *People v. Booker* (2011) 51 Cal.4th 141, 175 [an attempt requires the specific intent to commit the target offense and a direct but ineffectual step toward committing that offense].) We conclude it was not error to refuse to give the attempted aggravated mayhem instruction.

Defendant's federal due process claim fails because he was "allowed to present the defense he chose" and was not "deprived of the opportunity to present a complete defense." (See *Rogers*, *supra*, 39 Cal.4th at p. 872.) In *Rogers*, the defendant claimed that the court should have instructed the jury regarding the express malice form of second degree murder and that because that instruction " 'embodied the defense theory of the case,' " the court's instructional failure violated his due process right to present a complete defense. (*Ibid.*) Our Supreme Court rejected the claim because the defendant did not request the instruction and because, contrary to the defendant's contention, "it [could not] be said that the omitted instruction 'embodied the defense theory of the case.' " (*Ibid.*) Here, although defendant asked for the attempted aggravated mayhem instruction, he articulated no basis in the evidence for giving it. The theory that defendant intended to disfigure Jorge by inflicting the scars, but that stabbing Jorge repeatedly failed to accomplish that objective, was never presented in the trial court. Thus, the attempted aggravated mayhem instruction plainly did not " 'embod[y] the defense theory of the case,' " nor had defendant in any way built his defense around that theory. (*Ibid.*)

Moreover, we find no state law error by the trial court in denying the request. The trial court's obligation to instruct the jury on all general principles of law relevant to the issues raised by the evidence " 'encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' [Citations.]" (*Rogers*, *supra*, 39 Cal.4th at p.

17

866.)  Here, the theory that defendant intended only to disfigure Jorge but was unsuccessful does not "find substantial support in the evidence."  (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.)

Although the distinction did not figure at all in the trial of the case, it is true that there are two possible specific intents for aggravated mayhem:  intent to disable or intent to disfigure.  (§ 205.)  Nothing in the trial below focused on the specific intent to disfigure; this theory was never raised.  Instead, the trial was focused on the specific intent to disable.  Defendant conceded stabbing Jorge and causing him to be permanently paralyzed, i.e., disabled.  Defendant's defense was that he did not form the specific intent necessary to convict him of aggravated mayhem because he was so intoxicated.  As one witness described defendant the night of the incident, and as defendant repeats again and again in his briefing to this court, defendant was " 'drunk as fuck.' "  The specific intent evidence in this case was circumstantial, and defendant articulates no basis on which any of the evidence would support the specific intent to disfigure but not to disable Jorge.  Further, if defendant was too intoxicated to form the specific intent to disable, it is unclear why extreme intoxication would not also prevent him from forming the specific intent to disfigure.

Defendant's argument on appeal is premised on his interpretation of the jury's question.  According to defendant, "the deliberating jury's request for the definition of disfigurement in the context of aggravated mayhem and inquiry whether all scars constitute disfigurement show that the jury found the disfigurement question determinative and that the jury was struggling over whether the scars inflicted constituted disfigurement . . . ."  Defendant reads too much into the jury's question.  The inquiry reflects no more than that the jury sought clarification on the disfigurement element of aggravated mayhem.[7]  This is not surprising in light of the focus at trial on disability as

---

[7] At oral argument, defendant emphasized that the jury reached its verdict on assault with a deadly weapon and the paralysis enhancement (count 3) before the jury sent the note to the judge about the meaning of disfigurement.  This timing is not entirely clear from the record.  The verdict form for count 3 shows that it was dated June 20,

18

the basis for mayhem, and the fact that the standard aggravated mayhem instruction given to the jury included references to disfigurement, such as "[t]he defendant unlawfully and maliciously disabled *or disfigured* someone permanently," and "[w]hen the defendant acted, he intended to permanently disable *or disfigure* the other person." (CALCRIM No. 800, emphasis added.) The argument that the jury "found the disfigurement question determinative" is mere speculation. No such conclusion about the jury's thought process can reasonably be drawn.

However, even if the trial court should have instructed the jury on attempted aggravated mayhem on the untried and heretofore unmentioned theory that defendant intended to disfigure Jorge, and his act of stabbing him in the back was a direct but ineffective step toward disfiguring him, the error was harmless. "In determining whether a failure to instruct on a lesser included offense was prejudicial, an appellate court may consider 'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*Rogers*, *supra*, 39 Cal.4th at p. 870; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Here, there is overwhelming evidence that Jorge was disabled,[8] and we have upheld the jury's finding of specific intent to inflict the maiming injury as supported by substantial evidence. A verdict of attempted aggravated mayhem would require the jury to find that defendant intended *only* to disfigure Jorge, i.e., cause the scars, but did not also, or in the alternative, intend to disable Jorge when he stabbed him repeatedly in the back and nearly severed his spinal cord, *and* that the scars were not disfiguring. Defendant points to no evidence that supports a finding that defendant intended to

2013, presumably by the presiding juror, but the minutes and the reporter's transcript reflect that the verdict form for count 3 was submitted to the court at the same time as the other verdict forms were returned on all of the charged counts on June 24, 2013. The verdicts were all taken by the court, the jury was polled, and the verdicts were recorded— all on June 24, 2013.

[8] In his opening brief, defendant states "The evidence conclusively showed [defendant] was guilty of the lesser included mayhem on the disability theory."

19

disfigure Jorge but not to disable him.  Defendant also does not explain how the four scars (two of which were straight and approximately four centimeters and two centimeters in length, and two were "v" shaped and approximately five by three centimeters and three by two centimeters) were not disfiguring.  On this record, the evidence supporting the aggravated mayhem verdict is "so relatively strong," and the evidence supporting a verdict of attempted aggravated mayhem is "so comparatively weak," that there is no reasonable probability that the failure to instruct on attempted aggravated mayhem affected the result.  (See *Rogers*, *supra*, 39 Cal.4th at p. 870.)

C.      *Whether the Disfigurement Element of Mayhem Is Unconstitutionally Vague*

Defendant contends his conviction for aggravated mayhem should be reversed because section 205 is void for vagueness.  He argues the term "disfigurement" is unconstitutionally vague because of the indeterminacy of whether the scars constitute disfigurement, a "wholly subjective" term without a statutory definition, or settled legal meaning.

The Attorney General argues the disfigurement element is sufficiently certain under the plain meaning of the term, the legislative history of simple mayhem, and case law in effect at the time of defendant's offense.

*Legal Principles*

"The due process concept of fair warning is the underpinning of the vagueness doctrine, which 'bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application." '  (United *States v. Lanier* [(1997)] 520 U.S. 259, 266, quoting *Connally v. General Construction Co*. (1926) 269 U.S. 385, 391; *Lanzetta v. New Jersey* (1939) 306 U.S. 451, 453 ["No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes"].)  . . . 'Vagueness may invalidate a criminal law for either of two independent reasons.  First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and

20

discriminatory enforcement.' (*Chicago v. Morales* (1999) 527 U.S. 41, 56.)" (*People v. Castenada* (2000) 23 Cal.4th 743, 751.)

"This court has recognized 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143.) Therefore, 'a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that "the law is impermissibly vague *in all of its applications*." [Citation.]' (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1201.) Stated differently, ' "[a] statute is not void simply because there may be difficulty in determining whether some marginal or hypothetical act is covered by its language." [Citation.]' (*People v. Ervin* (1997) 53 Cal.App.4th 1323, 1329.)" (*People v. Morgan* (2007) 42 Cal.4th 593, 605-606.) Further, "the mere fact that close cases can be envisioned" does not "render[] a statute vague." (*United States v. Williams* (2008) 553 U.S. 285, 305-306.) "Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." (*Id*. at p. 306.)

*Analysis*

Defendant argues the disfigurement element of aggravated mayhem is unconstitutionally vague because the term is undefined, and neither the statute nor its history provide any guidance for determining what distinguishes a disfiguring injury from a non-disfiguring injury.

"In determining whether a statute is sufficiently certain to comport with due process standards, the court will 'look first to the language of the statute, then to its legislative history, and finally to California decisions construing the statutory language.' [Citation.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 581.) "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the

21

incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." (*United States v. Williams*, *supra*, 553 U.S. at pp. 288, 306.)

The term "disfigurement" in the context of the mayhem statutes is not impermissibly vague. "The word 'disfigure' is defined as 'to make less complete, perfect, or beautiful in appearance or character.' (Webster's Third New Internat. Dict. (1971) p. 649.)" (*People v. Newble* (1981) 120 Cal.App.3d 444, 452 (*Newble*).) As noted in *Newble*, " 'the modern rationale of the crime [of mayhem] may be said to be the preservation of the natural completeness and normal appearance of the human face and body . . . .' [Citation.]" (*Id.* at p. 451; see also *People v. Santana* (2013) 56 Cal.4th 999, 1004 (*Santana*) [" 'section 203 protects the integrity of the victim's person' "].) We discern no indeterminacy in the statute; nor does "disfigure" have a technical legal meaning that is different from its common meaning. (See *People v. Elam* (2001) 91 Cal.App.4th 298, 307 [no error in failing to instruct the jury on the meaning of commonly understood terms].) The statutory language embodies an objective concept that is sufficiently definite and certain to comport with due process. (See *People v. Speegle* (1997) 53 Cal.App.4th 1405, 1411 ["So long as the language embodies an objective concept, it is constitutionally concrete"].)

In *Newble*, the court rejected the defendant's contention that the term " 'disfigures' " was unconstitutionally vague in that "its common definition is necessarily subjective and therefore the statute provides insufficient notice of the proscribed conduct." (*Newble*, *supra*, 120 Cal.App.3d at p. 451.) The *Newble* court concluded the meaning of disfigure was "sufficiently definite and certain to inform a person of ordinary intelligence what acts are prohibited." (*Id*. at p. 453.) Moreover, as to the defendant in *Newble*, the court held section 203 was "sufficiently certain to put him on notice that slashing the victim's face with a sharp instrument so as to leave a permanent three-inch scar could reasonably be found to be disfigurement." (*Ibid*.)

Further, the legislative history of section 203 establishes that the concept of disfigurement has long been part of the law of mayhem. In *Santana*, *supra*, 56 Cal.4th 999, our Supreme Court recently examined the history of the offense of simple mayhem

22

and modern applications of the law. The crime of mayhem originated in the English common law, and "prohibited a person from dismembering or disabling another person, causing 'an injury which substantially reduced the victim's formidability in combat.' [Citations.]" (*Id.* at p. 1003.) England's Coventry Act of 1670 "later expanded the crime of mayhem to include 'mere disfigurement without an attendant reduction in fighting ability,' if the injury was intentionally inflicted." (*Ibid.*) In 1872, the crime of mayhem was codified as section 203 in the original Penal Code, and the statutory language has remained unchanged since 1874. (*Ibid.*) The history of the element of disfigurement as an aspect of mayhem weighs heavily in favor of rejecting defendant's vagueness challenge. (See *Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 60 ["a statute is sufficiently certain if it employs words of long usage or with a common law meaning, " 'notwithstanding an element of degree in the definition as to which estimates might differ' "].)

Moreover, case law in effect at the time of defendant's offense construing the meaning of disfigurement provided adequate guidance in determining what conduct was proscribed. (See *People v. Estrada*, *supra*, 11 Cal.4th at p. 581.) The Supreme Court in *Santana* described types of wounds that have been found to have been disfiguring within the meaning of mayhem. "For example, although 'not every visible scarring wound' may establish mayhem under section 203 (*Goodman*[ *v. Superior Court* (1978)] 84 Cal.App.3d [621,] 625), the following disfiguring injuries have given rise to a conviction: cigarette burns to both breasts ([*People v.*] *Keenan*[ (1991)] 227 Cal.App.3d [26,] 29); a breast nearly severed by a box cutter (*People v. Pitts* (1990) 223 Cal.App.3d 1547, 1559 . . .); a three-inch facial laceration from a fingernail file (. . . *Newble*, *supra*, 120 Cal.App.3d at p. 448); forcible tattoos on the breast and abdomen ([*People v.*] *Page*[ (1980)] 104 Cal.App.3d [569,] 576); and a five-inch facial wound from a knife (*Goodman*[ *v. Superior Court*], *supra*, 84 Cal.App.3d at p. 623.)" (*Santana*, *supra*, 56 Cal.4t at p. 1004.) Further, case law has clarified that a disfiguring injury must be permanent to constitute mayhem under section 203 (see *People v. Newby* (2008) 167 Cal.App.4th 1341, 1347), and that "an injury may be considered legally permanent for

23

purposes of mayhem despite the fact that cosmetic repair may be medically feasible" (see *People v. Hill* (1994) 23 Cal.App.4th 1566, 1574-1575).

Defendant's argument hinges on the absence of specificity regarding the level of scarring that constitutes disfigurement. However, " ' "a statute is sufficiently certain if it employs words of long usage or with a common law meaning, 'notwithstanding an element of degree in the definition as to which estimates might differ.' [Citations.]" ' [Citations.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 534.) Whether the degree of scarring constituted disfigurement was a question for the jury. Based on the statutory language, the long history of disfigurement as an element of mayhem, and case law that has construed the term, we have no trouble concluding defendant's void-for-vagueness challenge has no merit.

However, even if the term "disfigurement" is unconstitutionally vague, any instructional error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 167 (*Chiu*).) For present purposes, the legally correct theory of guilt was the disability theory of aggravated mayhem. The evidence was undisputed that defendant repeatedly stabbed Jorge in the back near his spinal cord, causing permanent disability within the meaning of section 205. The evidence of defendant's specific intent to inflict a maiming injury, either disability or disfigurement, was substantial, as we have already discussed, and was more probative of a specific intent to disable than to disfigure. There was never any distinction made in the evidence or argument in the trial court between the intent to disable and the intent to disfigure. Defendant makes no such argument in this court, and we discern no basis for any such distinction. Any juror who found defendant guilty of aggravated mayhem based on intending to disfigure the victim would unquestionably have found, under correct instruction, that defendant was guilty of aggravated mayhem based on intending to disable Jorge. Thus, the record shows beyond a reasonable doubt that a rational jury

24

would have convicted defendant of aggravated mayhem in the absence of the asserted instructional error. (See *Chiu, supra,* at p. 167.)[9]

D.      *Whether the Court Erred in Responding to a Question from the Jury*

Defendant contends the trial court's response to the jury's question concerning the definition of disfigurement violated his constitutional rights to a fair trial and to have the jury determine every material issue presented by the evidence. He argues that the court's answer, considered along with the aggravated mayhem jury instruction, "effectively instructed the jury that scarring wounds are disfigurement if permanent and not disfigurement if not permanent." At trial, defendant agreed with the court's response to the jury's question. On appeal, defendant does not indicate how he would correct the asserted error.

*Factual Background*

The trial court instructed the jury on aggravated mayhem with CALCRIM No. 800: "The defendant is charged in Count 2 with aggravated mayhem in violation of Penal Code Section 205. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant unlawfully and maliciously disabled or disfigured someone permanently. Two, when the defendant acted, he intended to permanently disable or disfigure the other person. And three, under the circumstances the defendant's act showed extreme indifference to the physical or psychological well being of the other

---

[9] Defendant argues that *Chiu, supra,* 59 Cal.4th 155, which involved aiding and abetting theories of murder, presents a similar situation to this case, and that the same result, i.e., reversal of the conviction, should obtain. We are not persuaded. In *Chiu,* based on notes from the deliberating jury, the trial court questioned several jurors, removed one juror, and substituted in an alternate juror, after which the jury returned a verdict. However, based on the substance of the trial court's discussion with the jurors, which indicated that the jury might have relied on the legally invalid theory and the holdout juror might have prevented a unanimous verdict on that theory, the Supreme Court could not conclude beyond a reasonable doubt that the jury ultimately relied on a legally valid theory. (*Id.* at pp. 167-168.) Here, the jury's question regarding the definition of disfigurement gives us no reason to suspect that the jury based its aggravated mayhem verdict on the mayhem theory of disfigurement, for the reasons we have explained.

25

person.  [¶] Someone acts maliciously when he or she intentionally does a wrongful act when he or she acts with the unlawful intent to injure someone else.  A disfiguring injury may be permanent even if it could be repaired by medical procedures.  [¶] The People do not have to prove that the defendant intended to kill.”

As we have discussed, during deliberations, the jury sent a note to the court asking:  “In the context of aggravated mayhem, what is the definition of disfigurement?  Are all stab wounds disfigurement?  Internal, external, cosmetic?”

The court discussed the question with counsel outside the presence of the jury.  In crafting a proposed response, the trial judge told counsel that he looked at the jury instructions, the statute and case law, and noted that no California case defined disfigurement in a particular way.  The court observed that “one thing does appear to be consistent throughout, that is, it has to be some very significant injury.  The fact that it’s visible or in an area which is less visible isn’t determinative.”  The court continued:  “And I think as the People will point out, you can burn someone’s breast with a cigarette, an area which isn’t normally viewed, you can tattoo someone permanently in an area which may not be viewed, and the fact that it is usually concealed from the public doesn’t relieve the defendant of responsibility for mayhem.  [¶] So the best I can come up with is a conclusion that not every visible scarring wound is mayhem.  But as to what constitutes disfigurement, I think is ultimately for the jury to decide.”

The prosecutor then suggested including some examples of mayhem from case law.  Defense counsel objected to giving examples because “there is no way for the Court to give enough examples to define the meaning of it.”  Defense counsel continued:  “I think the instruction the Court proposes to give is appropriate.  And I think the case law is clear that not every, as the Court is going to say, not every scar is disfigurement, and based upon the case law it’s up to the jury to decide.”

Following this discussion, the court answered the jury’s question as follows:  “While not every scarring wound constitutes disfigurement in the context of aggravated mayhem, it is up to the jury to decide whether the injuries in this case constitute disfigurement.”

*Legal Principles*

Section 1138 "requires the court to provide the jury any desired information 'on any point of law arising in the case.' " (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) The court "must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Id.* at p. 97.)

A trial court's error under section 1138[10] is reviewed for abuse of discretion. (*People v. Hodges* (2013) 213 Cal.App.4th 531, 539, 543; see *People v. Waidla* (2000) 22 Cal.4th 690, 746-747.) "The court's failure under section 1138 to adequately answer the jury's question 'is subject to the prejudice standard of *People v. Watson*[, *supra*,] 46 Cal.2d 818, 836,' i.e., whether the error resulted in a reasonable probability of a less favorable outcome. (*People v. Roberts* (1992) 2 Cal.4th 271, 326.)" (*People v. Eid* (2010) 187 Cal.App.4th 859, 882.)

*Analysis*

Defendant's contention that his constitutional rights were violated by the court's inadequate response to the jury's question is without merit. First, defendant waived the claim by agreeing to the trial court's proposed response to the jury question and arguing

---

[10] Section 1138 specifies the procedure for receiving and responding to jury questions: if a deliberating jury "desire[s] to be informed on any point of law arising in the case," the jury must be brought into court and "the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel. . . ."

27

against providing any further instruction. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [claim of error was waived where defendant "both suggested and consented to the responses given by the court"]; *People v. Thoi* (1989) 213 Cal.App.3d 689, 698 [any error was waived or invited where counsel "actively and vigorously lobbied against further instruction"].)

Defendant relies on *People v. Litteral* (1978) 79 Cal.App.3d 790 (*Litteral*) in arguing that he did not waive his objection under section 1138. In *Litteral*, the trial court refused the jury's request for the readback of testimony during its deliberations. (*Id.* at p. 794.) The appellate court found the defendant did not have to object to preserve the claim of error under section 1138, reasoning that "the jury was deprived of the 'fundamental right to be apprised of the evidence upon which they (were) sworn conscientiously to act.' [Citation.] And in light of the fact that there was no mention of what testimony the jury desired reread, defendant had no more reason to support the jury's desire than did the district attorney. It would be unreasonable to place upon the defendant the burden of becoming an advocate for the jury's right to rehear evidence which could conceivably unlock a previously deadlocked jury." (*Id.* at pp. 796-797.) *Litteral* is not helpful to defendant, however, because the error there was the court's failure to provide the jury with actual trial testimony. Here, the court provided the answer to a legal question where defense counsel had an opportunity to be heard and agreed to the answer the court planned to give the jury.

Second, any error was invited by defendant. " 'The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a "conscious and deliberate tactical choice" to "request" the instruction.' [Citations.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 970; *People v. Enraca* (2012) 53 Cal.4th 735, 761.) Defendant contends invited error does not apply here because defendant did not "request" the court's response; he "agreed to it as a better alternative to the prosecutor's proposal." We disagree. Defense counsel opposed the prosecutor's suggestion of giving examples of disfigurement and affirmatively stated, "I think the instruction the Court proposes to give is appropriate. And I think the case law is clear

28

that not every, as the Court is going to say, not every scar is disfigurement, and based upon the case law it's up to the jury to decide." On this record, it is apparent that defense counsel " 'express[ed] a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction . . . .' [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 830.) Defense counsel acted "intentionally," as opposed to acting "out of 'ignorance or mistake.' " (*Ibid*.) Defense counsel "made a conscious tactical choice," and thus any error was invited. (*Id*. at p. 831.)[11]

Defendant's claim also fails on the merits, which we will address in the interests of judicial economy in light of defendant's alternative ineffective assistance of counsel claim. To restate, defendant contends the court's response, in conjunction with CALCRIM No. 800, effectively instructed the jury that any permanent scar constituted disfigurement. These instructions, however, are based on California case law, as defense counsel pointed out in agreeing with the court's proposed response to the jury. The California Supreme Court has recognized that " 'not every visible scarring wound' " constitutes mayhem. (*Santana*, *supra*, 56 Cal.4th at p. 1004, quoting *Goodman v. Superior Court*, *supra*, 84 Cal.App.3d at p. 625.) To prove mayhem based on a disfiguring injury, the disfigurement must be permanent. (*People v. Newby*, *supra*, 167 Cal.App.4h at p. 1347.) Whether an injury constitutes disfigurement is a question for the trier of fact. (See *Newble*, *supra*, 120 Cal.App.3d at p. 453 [declining to disturb the trier of fact's reasonable finding that a permanent facial scar was disfigurement]; *Goodman v. Superior Court*, *supra*, 84 Cal.App.3d at p. 625 [same].) With respect to disfigurement, CALCRIM No. 800 instructed the jury that, for aggravated mayhem, the disfiguring injury must be permanent, and a disfiguring injury may be permanent even if it can be

---

[11] The Attorney General also asserts that this claim is barred by judicial estoppel, which " ' " 'precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.' " ' " (*People v. Castillo* (2010) 49 Cal.4th 145, 155.) Defendant disputes that all the elements of judicial estoppel are met. The application of the judicial estoppel doctrine is discretionary (*id.* at p. 155), and in light of our determination that any error was invited, we need not decide the estoppel issue.

repaired medically. The court's response to the jury's question advised the jury that not every visible scar constituted disfigurement, and it was up to the jury to decide whether the injuries in this case constituted disfigurement. From these instructions, no reasonable juror would understand that " 'scarring wounds are disfigurement if permanent and not disfigurement if not permanent.' " The court expressly left to the jury the issue of whether Jorge's injuries constituted disfigurement. Defendant has failed to establish any error.

Finally, even assuming the court erred, there is no reasonable doubt that the jury would have returned the same verdict in the absence of the error. (*Chapman v. California, supra,* 386 U.S. at p. 24.) As we have discussed, defendant permanently disabled Jorge. The same circumstantial evidence was relevant to defendant's specific intent to inflict a disfiguring injury and/or a disabling injury. In fact, defendant's act of repeatedly stabbing Jorge in the back near the spinal cord is more probative of a specific intent to disable than to disfigure. Thus, any error did not violate defendant's constitutional rights.

E.      *Whether the Court Erred in Refusing to Modify the Probation Report*

Defendant contends the trial court abused its discretion in refusing to strike a sentence in a report prepared by the probation department in which, defendant argues, the probation officer purported to override the findings of the COMPAS Risk Assessment.[12]

*Factual Background*

In a report submitted to the court, the probation department recommended that probation be denied. The narrative section of the report states, in part: "The COMPAS Risk Assessment was administered. The findings suggest the defendant has a low probability for violent recidivism and a medium probability for general recidivism. There were no potential faking or inconsistent response concerns. *However, due to the gravity of the offense, the assessment has been overridden to 'High'.* [¶] The assessment

---

[12] The Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) is an automated needs assessment tool. (Cal. Code Regs., tit. 15, § 3375.6.)

30

detected criminogenic factors relative to the defendant's peer associations, personality, attitudes, and substance abuse.  He may have a modest involvement with anti-social peers, subjecting him to probable high levels of criminal opportunity situations.  The defendant's personality may be hindered by impulsive decision-making, risk-taking, restlessness and/or anger.  There may be the presence of some attitude problems that have allowed the defendant to minimize the impact of his substance abuse until now.  [¶] The defendant acknowledges his alcoholism.  He believes the instant offense would not have occurred had he not been 'really drunk.'  The defendant expressed remorse for his conduct, recognizing that his actions not only impacted the victim, but also his family and friends.  [¶] Although it does not appear that the defendant has made a lifestyle out of criminal activity, the enormity of this crime warrants a maximum penalty as prescribed by law.  A state prison commitment is warranted."

At the sentencing hearing, defense counsel argued, with respect to the italicized sentence above, that it was improper for the probation officer to override the risk assessment:  "If they're going to give someone a psychological exam . . . they shouldn't be allowed to override the results of that exam based upon their own feelings."  Counsel asked the court to strike the last sentence of the quoted portion of the report, adding that "there's no point in doing an assessment of the defendant if it can be overridden based upon the seriousness of the crime.  That's not the purpose of the risk assessment."  The court denied defense counsel's request, stating "I'll let the [p]eople reviewing it take from it what they will."

*Legal Principles*

"The purpose of a probation report is to assist the sentencing court in determining an appropriate disposition.  [Citation.]  The court has the unquestioned discretion to reject it in part or in toto.  [Citation.]  There is no reason why the power to 'strike' a report should not similarly fall within the discretionary province of the trial court." (*People v. Municipal Court* (*Lopez*) (1981) 116 Cal.App.3d 456, 459; see also *People v. Warner* (1978) 20 Cal.3d 678, 683, superseded by statute on another ground as stated in *People v. Douglas* (1999) 20 Cal.4th 85, 92, fn. 6.)

*Analysis*

Defendant contends that "since the probation officer had no valid reason for overriding the COMPAS assessment, the trial court abused its discretion in denying [defendant's] request to delete the sentence in the probation report." In support of this argument, defendant asserts that "research confirms that the trial court abused its discretion." Defendant describes the COMPAS assessment based on information apparently gleaned from the website of the California Department of Corrections and Rehabilitation and quotes a statement attributed to the developer of the COMPAS assessment in a white paper found at that company's website. These materials do not appear in the record, and defendant has filed no request for judicial notice; they are not properly before us.

Defendant does not otherwise support his argument that the trial court abused its discretion. This is patently insufficient. No error appears.

F.    *Ineffective Assistance of Counsel*

Defendant's final contention is a catch-all ineffective assistance of counsel claim in which he argues that, if defense counsel at trial failed to fully preserve any of the claims he raises on appeal, then counsel's representation was prejudicially inadequate and defendant's conviction of aggravated mayhem must be reversed. The only issue to which an ineffective assistance of counsel claim based on failure to preserve the issue for appeal could apply is the jury question, i.e., whether the court erred in responding to the jury's request for clarification regarding disfigurement.

To establish a violation of the constitutional right to effective assistance of counsel, a defendant must demonstrate both deficient representation under an objective standard of professional reasonableness and a reasonable probability that a more favorable result would have obtained in the absence of counsel's failings, i.e., prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.)

Here, we have already determined on the merits that the trial court's response to the jury's question was not in error.  Accordingly, defendant cannot establish either deficient representation or a reasonable probability of a better result.

### III.  DISPOSITION

The judgment is affirmed.

_____
Miller, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.